**HELLENIC LINES LIMITED, Plaintiff,**

v.

**Harry WINKLER, Defendant.**

United States District Court
S. D. New York.

Feb. 4, 1966.

---

7. See 306 F.2d 1, 8 n. 14, quoted in part in 331 F.2d 678, 680 n. 1.

Hill, Betts, Yamaoka, Freehill & Long-cope, New York City, for plaintiff, John F. Lang, New York City, of counsel.

David L. Reifer, New York City, for defendant.

FEINBERG, District Judge.

Hellenic Lines Limited ("Hellenic"), a Greek corporation, brings this action against Harry Winkler ("Winkler"), a citizen of New York, based on a judgment for $100,545.35 Hellenic has against Intercontinental Railway Tie Corporation ("Intercontinental"), a New York corporation.[1] The gravamen of the action is that the corporate veil of Intercontinental should be pierced through to Winkler who controls the corporation. Hellenic's judgment against Intercontinental was founded upon breach of two contracts of affreightment between Hellenic and Intercontinental. The judgment was entered in November 1961, and supplementary proceedings revealed to Hellenic the absence of funds in Intercontinental's coffer.[2] The basic issue before this court is whether Winkler should be personally liable for the $100,545.35 judgment against Intercontinental.[3]

Plaintiff Hellenic's case must depend primarily upon the testimony or admissions[4] of defendant Winkler, since he was called as plaintiff's sole witness.[5] Reconstruction of the incorporation of Intercontinental and its early years is difficult due to the passage of time and the death of attorneys who represented the corporation.[6] A certificate of incorporation was filed with the New York State Department of State on January 30, 1948, for a corporation named "I.T.C. Intercontinental Railway Tie Corporation."[7] This corporation was to specialize in supplying American railway ties to foreign railroads and, according to Winkler, was formed by him, his wife,

1. Plaintiff's Exhibit [hereinafter cited as "Pl. Ex."] 1.

2. Transcript [hereinafter cited as "Tr."] pp. 16–17.

3. Since the point has not been raised by defendant, it will be assumed that failure to join Winkler in the first litigation does not bar this action procedurally or prevent application of the judgment to this defendant.

4. Pl. Ex. 12.

5. Defendant Winkler also offered the testimony of his wife, Ilse Winkler, and George Niebour, a bank employee who had custody of certain exhibits received in evidence.

6. Tr. pp. 30, 34, 38.

7. Pl. Ex. 4.

and an attorney, Mr. Helman, or a Mrs. Guth.[8] However, the certificate lists as incorporators four women who were then employed as secretaries by a corporation which Winkler controlled.[9] The certificate authorized the issuance of 200 shares of stock without par value.[10] Winkler believes he was the sole original subscriber to the corporate stock, although the certificate of incorporation reflected the required commitment of each incorporator to take one share of stock.[11] Winkler admits that he never received his stock, the consideration for which was his "world wide experience and connections," work for the corporation and the payment of small cash expenses.[12] He believes that there were minutes of the incorporators' meeting, attended by him and Mrs. Winkler in Helman's office.[13]

Further, according to Winkler's testimony, the original board of directors consisted of Winkler, Mrs. Winkler and Helman.[14] After a stroke, Helman was succeeded by a Mrs. Kneitel, another attorney, who took over Helman's affairs.[15] Mrs. Kneitel died about 1962, and she was replaced by another attorney. Although a search has been made, no one has been able to find the corporate minutes or stock book.[16] Winkler testified that there were directors' meetings from time to time and minutes were kept by the first two attorneys, but he was unclear as to who had custody of them at any time after Helman's stroke.[17] Mrs. Winkler testified that she remembered attending and signing minutes of directors' meetings.[18] After Mrs. Kneitel's

death, no director replaced her.[19] Meanwhile, the officers of Intercontinental consisted of Winkler, as president, and Mrs. Winkler, as vice president. Winkler recalled that he was also treasurer and Mrs. Winkler was secretary, but her recollection was that she was treasurer. Mrs. Guth was also a vice president.[20] Winkler and his wife remain directors today.[21]

█ The affairs of Intercontinental were carelessly handled with a minimum of attention paid to corporate formalities. However, such practices are not uncommon with small close corporations. The testimony of the Winklers must be taken with a grain of salt. Yet, the failure of recollection and some inconsistencies are understandable, in view of the death of the attorneys for the corporation upon whom Winkler relied to take care of corporate procedures,[22] the concomitant loss of files and papers, the lapse of time since the events in question, and a layman's unfamiliarity and disinterest in corporate mechanics. I find from all of the evidence that a corporation bearing the name "I.T.C. Intercontinental Railway Tie Corporation" was formed in 1948, that there were directors and officers, that there were meetings of directors from time to time, and that some minutes were kept.

Intercontinental had its office, rent free, in a building owned by Eres International Corporation, controlled by Winkler. Intercontinental has had no employees, furniture, file cabinets, books of account, journals or liquid assets.[23] It had no bank account with an exception

8. Tr. pp. 18–20.

9. Tr. pp. 79–81.

10. Pl. Ex. 4.

11. Tr. p. 19.

12. Tr. pp. 22–23, 127.

13. Tr. pp. 19–22.

14. Tr. p. 22.

15. Tr. pp. 24, 31–33.

16. Tr. pp. 27–28.

17. Tr. pp. 22–27.

18. Tr. pp. 149–52.

19. Tr. pp. 37–38.

20. Tr. pp. 39–40, 149.

21. Tr. p. 41. Defendant's Exhibit [hereinafter cited as "Def. Ex."] A–2, a certification as to officers, dated March 26, 1957, indicates that Winkler was president and treasurer, Mrs. Guth was secretary, and Mrs. Winkler was second vice president and assistant treasurer.

22. Tr. p. 84.

23. Tr. pp. 41–43.

to be discussed below.[24] Intercontinental has filed New York State franchise tax returns several times at least, including periods both before and after the crucial transaction with Hellenic.[25] It conducted no business from 1948 until the transactions giving rise to this and the prior litigation, and then was again dormant.[26] In December 1955, Intercontinental obtained an order to sell railway ties to an agency of the Egyptian government for the sum of $1,650,000, F.O.B. United States ports. In connection therewith, the Egyptian agency established a letter of credit with The National City Bank in favor of Intercontinental for the sum of $1,528,830.[27] After getting the order, Intercontinental encountered difficulty both in getting credit from suppliers of ties and in obtaining a performance bond required by the Egyptian purchaser. Therefore, it was decided that Ernst Seidelmann Corporation ("Seidelmann"), which could obtain the necessary credit, would handle the job.[28] Seidelmann is a New York corporation incorporated in 1945 by Winkler and his brother to be in the international lumber business. Winkler himself had been in the lumber business since 1925.[29] Seidelmann was in the same building as Intercontinental, and its original directors were Winkler, Mrs. Winkler and Mr. Helman or Mrs. Guth; the first two are the only directors today.[30] Originally, stock was issued only to Winkler; later, one-third went to his brother, and this was returned when the brother died in 1952. A few years ago, Mrs. Guth received ten per cent of the stock.[31] At other times, Winkler was the sole stockholder (except for periods when stock was pledged pursuant to loans); it was Winkler in the period between 1952 and a few years ago who operated and ran Seidelmann. The positions of officers were filled in much the same way as in Intercontinental.[32]

Intercontinental's contract to sell railroad ties to the Egyptian agency was assigned to Seidelmann early in 1957;[33] the proceeds of the letter of credit were also assigned to Seidelmann.[34] Seidelmann assumed the obligations of furnishing the railway ties to the Egyptian buyer.[35] Subsequently, Seidelmann made approximately $4,000 profit out of the performance of the contract; these proceeds were retained by Seidelmann and not turned over to Intercontinental.[36] To effectuate the assignment, Intercontinental opened an account at Netherlands Trading Society in New York City and furnished the bank with an authorization to transfer funds to Seidelmann under the Egyptian letter of credit, a bank resolution stating the officers authorized to sign for Intercontinental, a loan agreement, and an authorized signature card.[37] As payments became due from the Egyptian agency on the contract, the proceeds were paid under these documents by the bank to Seidelmann.[38]

Subsequent to the assignment of the contract with the Egyptian agency and the letter of credit, Intercontinental entered into the transaction with Hellenic that gave rise to the prior lawsuit and this litigation.[39] It was found by this

24. Tr. pp. 43–49.

25. Tr. pp. 86–87; Pl. Exs. 5, 6.

26. Tr. pp. 97, 120.

27. Tr. pp. 96–97, 114; Pl. Ex. 3. The letter of credit was originally opened in favor of "International Railways Ties Corporation," but was amended by supplementary letter dated April 5, 1956, to be in favor of "Intercontinental Railway Tie Corporation." Pl. Ex. 3, p. 2.

28. Tr. pp. 114–15, 126–27.

29. Tr. p. 17.

30. Tr. pp. 70–72.

31. Tr. pp. 72–74.

32. Tr. pp. 74–77.

33. Tr. pp. 118, 132.

34. Pl. Ex. 12, pp. 15, 19.

35. Tr. pp. 99, 115.

36. Tr. p. 99; Pl. Ex. 12, p. 18.

37. Tr. pp. 59–60; Def. Exs. A–1, A–2, A–3, A–4.

38. Tr. p. 98; Def. Ex. B.

39. Tr. pp. 134–35. Plaintiff agrees that the assignments preceded the transaction with Hellenic. Plaintiff's Proposed Findings of Fact Nos. 24, 25.

court in the earlier litigation that by agreements dated March 21, 1957, Intercontinental, through its agent Pensacola Shipping Co., agreed to ship 3,000 tons of creosoted railway ties from Pensacola, Florida to Alexandria, Egypt on Hellenic ships. Each agreement was signed on behalf of Hellenic by an agent, Fillette, Green & Co., Inc.[40] Although there is evidence that at the time Winkler, acting for Intercontinental, regarded the letter agreements as "provisional" and not binding contracts,[41] the subsequent finding of this court was to the contrary, at least insofar as objective and not subjective intent was relevant.[42] Shipment of the railway ties via Hellenic's ships, as called for by Intercontinental's agreements with Hellenic, was never made. The resulting loss to Hellenic was the basis of the judgment in this court against Intercontinental for $100,545.35.

Hellenic's basic assertion that Winkler should be held personally liable is translated into four claims. These are that (1) Winkler controlled Intercontinental as his mere agency with complete disregard of corporate form; (2) Winkler perpetrated a fraud on Hellenic by causing Intercontinental to assign to Seidelmann the proceeds of the sale of the railway ties to the Egyptian agency; (3) Winkler misrepresented to Hellenic that Intercontinental was a corporation and Hellenic relied thereon; and (4) Intercontinental was not a legally existing corporation and Winkler conducted business under the assumed name of "Intercontinental Railway Tie Corporation."

 The last argument will be dealt with first, since it causes the least difficulty. The basis of this claim is that the initials "I.T.C." appeared in the corporate name in the 1948 certification of incorporation but were frequently omitted in the course of the corporation's affairs. Hellenic apparently argues that, while there may have been a corporation named "*I.T.C.* Intercontinental Railway Tie Corporation" (emphasis added), no corporation existed under the name of "Intercontinental Railway Tie Corporation."[43] It further argues that since its contracts were with an entity bearing the latter name, that entity must have been the assumed name under which Winkler was operating a business. It concludes, therefore, that the contracts upon which it recovered a judgment of $100,543.35 were entered into with Winkler as an individual. This was not the theory upon which Hellenic's judgment was obtained, and a question might be raised whether this argument carried to its logical extreme affects the validity of the judgment itself. However, it is not necessary to consider this point. New York law is clear that an immaterial variance in the corporate name on the contract does not defeat the intention of the parties to bind the corporation.[44] There is nothing in the record to suggest that the parties did not intend to bind the corporation, and Hellenic does not claim that it was misled by the omission of "I.T.C." in Intercontinental's dealings with it. Therefore, this minutia does not dissolve the veil. See Mail & Express Co. v. Parker Axles, Inc., 204 App.Div. 327, 198 N.Y.S. 20 (1st Dep't 1923); Van Norden Trust Co. v. L. Rosenberg, Inc., 62 Misc. 285, 114 N.Y.S. 1025 (App. T.1909); Mechanicville War Chest, Inc. v. Butterfield, 110 Misc. 257, 181 N.Y.S. 428 (Saratoga County Ct. 1920).

The basic issue of whether other factors call for a piercing of the corporate

---

40. Hellenic Lines, Ltd. v. Intercontinental Railway Tie Corp., Ad. 192–175, S.D.N.Y., November 13, 1961, p. 1.

41. Tr. pp. 105–06, 115.

42. Under contracts principles, of course, objective appearances rather than the subjective desires of the parties control in determining whether a contract has been entered into. Restatement, Contracts § 20 (1932).

43. Hellenic makes no point regarding the variance between "Tie" in the certificate of incorporation and "Ties" (emphasis added) in various corporate documents, e. g., Pl. Exs. 8, 9.

44. Both parties assume that substantive New York law applies, and there seems no good reason to question this assumption on the facts of this case.

veil is more difficult. In Fisser v. International Bank, 282 F.2d 231, 237–238 (2d Cir. 1960), the court said "[a]n examination of all the cases which the parties cite and of many others dealing with * * * [the problem of independent corporate existence] has left us with the conviction that nowhere is there a better statement of the generally applicable principles than that found in" Lowendahl v. Baltimore & O. R. Co., 247 App.Div. 144, 287 N.Y.S. 62 (1st Dep't), aff'd, 272 N.Y. 360, 6 N.E.2d 56 (1936). *Fisser* and *Lowendahl* dealt with the corporate veil problem in its parent-subsidiary aspect, but it is interesting to note that basic to the *Lowendahl* analysis are such concepts as fraud, violation of legal duty, dishonesty and unjust conduct. Elsewhere it is authoritatively stated that courts pierce the corporate veil to prevent fraud or to achieve equity. International Aircraft Trading Co. v. Manufacturers Trust Co., 297 N.Y. 285, 292, 79 N.E.2d 249 (1948). This broad standard is frugally applied, however. In none of the three last-cited cases was the corporate form disregarded. In Jenkins v. Moyse, 254 N.Y. 319, 172 N.E. 521, 74 A.L.R. 205 (1930), a one-man corporation was created for the sole purpose of avoiding the impact of the usury laws; yet, this subterfuge was not deemed improper enough to warrant piercing the veil.[45] In *Jenkins*, the incorporator himself was seeking dissolution of the corporate shield, but the policy of the decision is still plain because usury laws are designed to protect man from his own folly. In an early action against an individual for injuries caused by a negligent wagon driver, it was held that evidence of mal- or non-function sufficient to deprive a corporation of the right to continued existence was irrelevant, even though the key issue was whether defendant or that corporation was the employer of the driver. Werner v. Hearst, 177 N.Y. 63, 69 N.E. 221 (1903). In a somewhat different context, it was assumed that a corporation is viewed as an entity separate from its stockholders if "no rule of common sense or common justice is thereby violated" and "no wrong or fraud is shielded by the corporate charter." See Halsted v. Globe Indemnity Co., 258 N.Y. 176, 179, 179 N.E. 376 (1932). Moreover, "each case must be regarded as sui generis." Pagel, Horton & Co. v. Harmon Paper Co., 236 App.Div. 47, 258 N.Y. S. 168, 171 (4th Dep't 1932).

In my judgment, no "rule of common sense or common justice" would be violated by respecting the limited liability Intercontinental offered its owner. Intercontinental's corporate procedures were minimal, to be sure, but no funds oscillated at Winkler's will between him and Intercontinental. Winkler did not mislead plaintiff by personal guarantees or other misrepresentations as to Intercontinental's solvency. The corporation had been formed in 1948, so that it cannot be said that its creation was part of a plan to trap Hellenic.[46] The contract with the Egyptian agency was assigned to Seidelmann because Intercontinental's credit was insufficient to obtain financing for the sale of the railroad ties. This was a legitimate business reason. Moreover, since the assignment occurred before the contracts with Hellenic and there is doubt that Winkler realized at the time of the later transaction with Hellenic that any binding obligation was then being created, the assignment was not an attempt to evade an existing obligation.[47] Seidelmann profited from the assigned contract to supply railroad ties to the Egyptian agency, it is true, but only to the extent of $4,000, hardly overpowering evidence of a fraudulent scheme. Moreover, nothing had been gained from Hellenic; its ship was not used. Hellenic

---

45. But see Gilbert v. Doris R. Corp., 111 So.2d 682 (Dist.Ct.App.Fla.1959).

46. Cf. Cleary v. Higley, 154 Misc. 158, 277 N.Y.S. 63, 68 (Sup.Ct.1934), aff'd mem., 246 App.Div. 698, 284 N.Y.S. 989 (1st Dep't 1935).

47. This is not to suggest that the finding in the prior litigation that the contracts with Hellenic were binding was incorrect. See note 42 supra and accompanying text.

contends that this assignment is evidence of fraud but made no attempt to proceed against Seidelmann. It has not proved any statement of defendant's that misled it. Moreover, no reason has been given why Hellenic made no investigation of Intercontinental's financial standing, which would have disclosed that it had no assets.[48] To pierce the veil on these facts would be unwarranted.

Plaintiff has cited many cases in which the corporate veil has been pierced. They only emphasize that, as in any instance of application of broad legal concepts to particular situations, the facts of the case at hand control. Thus, in Majestic Factors Corp. v. Latino, 15 Misc.2d 329, 184 N.Y.S.2d 658 (Sup.Ct.), appeal dismissed, 8 A.D.2d 594, 187 N.Y. S.2d 1017 (1st Dep't 1959), there had never been a corporate bank transaction, meeting, election, or tax return. Additionally, it appeared that all orders obtained by the corporation were immediately turned over to the defendants, who shipped the goods and to whom payment was turned over. In this case, Intercontinental did observe some of the corporate formalities, and there was no pattern of turning over business to defendant Winkler or to Seidelmann. In P. S. & A. Realties, Inc. v. Lodge Gate Forest, Inc., 205 Misc. 245, 127 N.Y.S.2d 315 (Sup.Ct.1954), one of the individual defendants manipulated the corporation at will, determining on an *ad hoc* basis who were the stockholders and officers. Moreover, there were present there many misrepresentations by the individual defendant held liable. In B. Bressman, Inc. v. Mosson, 127 Misc. 282, 215 N.Y.S. 766 (App.T.1926) (per curiam), only the president drew a salary, and the only money drawn out of the corporation was taken by him for family expenses. In the present case, of course, Intercontinental never had any assets, so there is no evidence that defendant was running the corporation as a personal checking account. In the often cited case of Quaid v. Ratkowsky, 183 App.Div. 428, 170 N.

Y.S. 812 (1st Dep't), aff'd mem., 224 N. Y. 624, 121 N.E. 887 (1918), in addition to not following corporate procedures, the virtual owner of the corporation held himself out as being identical to the corporation and as standing behind it for credit purposes, and used the whole corporate income as his private property. In African Metals Corp. v. Bullowa, 288 N.Y. 78, 41 N.E.2d 466 (1942), one individual defendant appropriated the sums payable to the corporation and another defendant gave false affidavits to plaintiff. Other cases cited by plaintiff are similarly distinguishable. Plaintiff vigorously urges that Intercontinental's under-capitalization warrants disregard of the corporate form, relying heavily on Mull v. Colt Co., 31 F.R.D. 154 (S.D.N.Y. 1962).[49] That case arose out of an accident in which plaintiff allegedly sustained serious injuries from a taxicab owned by a corporation. Plaintiff sued, among others, the controlling shareholders of the corporation, who had allegedly incorporated 200 taxicabs as 100 two-cab corporations, each carrying the minimum statutory liability insurance. In denying a motion to dismiss, the court held that in these circumstances inadequate capitalization was one of the grounds upon which plaintiff could pierce the corporate veil. In *Mull*, use of multiple shell corporations to insulate owners of taxicab fleets against tort liability posed policy issues not present in this case. A later New York case, which did not involve a common carrier, held that the absence of corporate assets was a factor in defendant's favor when plaintiff sought to pierce the corporate veil. Alfred P. Sloan Foundation, Inc. v. Atlas, 42 Misc. 2d 603, 248 N.Y.S.2d 524 (Sup.Ct.1964), aff'd mem., 23 A.D.2d 820, 258 N.Y.S.2d 807 (2d Dep't 1965).

█ In sum, it is not necessary to admire the method by which Intercontinental was conducted in order to refuse to pierce the veil here. This is a case where plaintiff "has been disappointed, not in failing to get the promise which it sup-

---

48. Cf. Pl. Ex. 12, p. 23.

49. Plaintiff's Supplemental Trial Memorandum, pp. 2–5.

posed, but in its performance, a risk inherent in any contract." See Kingston Dry Dock Co. v. Lake Champlain Transp. Co., 31 F.2d 265, 267 (2d Cir. 1929). Plaintiff corporation was neither misled nor overreached; it took Intercontinental as it found it, and there the matter must lie. Accordingly, after considering all of the evidence, I find that Intercontinental was a legally existing corporation, that it was not operated with complete disregard of corporate form, that Winkler did not perpetrate any fraud on Hellenic, that he did not misrepresent to Hellenic, and that plaintiff's action fails. Therefore, it is unnecessary to deal with defendant's argument that plaintiff is estopped in the present action.

The foregoing incorporates findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a). Judgment may be entered in accordance with this opinion.