**BRUNSWICK CORPORATION, Plaintiff,**

v.

**Harry WAXMAN and Evelyn Waxman, Harry Waxman, Benne Katz, Martin C. Barell, as Executors of the Estate of Sydney W. Waxman, Deceased, said Harry Waxman and Sydney W. Waxman being sued individually and as copartners doing business as Turnpike Lanes, Pike Lanes, Inc. and Waxman Construction Corp., Defendants (two cases).**

Nos. 70 Civ. 823, 70 Civ. 1274.

United States District Court,
E. D. New York.

Sept. 15, 1978.

Blumberg, Singer, Ross, Gottesman & Gordon, New York City, for plaintiff; Frederick Newman, Alfred K. Kestenbaum, New York City, of counsel.

Moses & Singer, New York City, for defendants; Daniel Eisenberg, Eugene I. Farber, New York City, of counsel.

BARTELS, District Judge.

This is a diversity action instituted by the plaintiff to recover from the officers and shareholders of Waxman Construction Corp. the sum of $1,188,310.72 (minus unearned finance charges) plus interest. This amount represents the deficiency due under

conditional sale contracts signed by Harry Waxman as president and Sydney W. Waxman as secretary of the Waxman Construction Corp., pursuant to which that corporation purchased certain bowling equipment from the plaintiff. Named as defendants were the individuals Harry Waxman and Sydney W. Waxman [1] (the "Waxmans"), who, although not individual signatories to the contracts, operated the bowling equipment under a partnership agreement. The gravamen of the complaint is that because the Waxmans operated the bowling equipment in their individual capacities, the corporate veil of Waxman Construction Corp. should be pierced and the Waxmans held personally liable.

The case was tried without a jury and after considering the testimony and the exhibits, the court has reached the conclusion set forth in the following opinion which contains its findings of fact and conclusions of law.

## FACTS

In 1960, Harry and Sydney W. Waxman were in business as general partners, owning and managing substantial real estate holdings in the New York area. This property, which the Waxmans held in the name of a number of partnerships and corporations, included a bowling alley, Seaview Lanes, in Brooklyn, New York. Encouraged by their success in operating Seaview Lanes, the Waxmans decided to expand their bowling operations, and in early 1960 contacted Brunswick Corporation to discuss the purchase of bowling equipment. During these discussions, in which Brunswick was represented by its local sales force, the Waxmans indicated that they were interested in making bowling equipment purchases through a no-asset corporation which would act as the purchaser and obligor on any conditional sale agreements. Negotiations between Brunswick and the Waxmans produced a tentative sale agreement, and in August 1960, the Waxmans formed a corporation with the name of "Waxman Construction Corp." (hereinafter "Construction Corp."), a no-asset New York corporation, to act as signatory on the sale contracts.

Prior to completion of the equipment sales, the tentative sale agreement was referred to Brunswick's home office for review and approval. Because the agreement called for long-term payment of the contract sale price, an important aspect of the home office review was a determination of the creditworthiness of the prospective buyer. Recognizing that the buyer in this case was to be a no-asset corporation, the credit department looked to a number of factors other than the corporation's worth in deciding whether to approve the sales. Brunswick considered the credit of the corporation's principals, as a general indication of whether the principals behind the new corporation were likely to act responsibly towards the corporation's creditors. More important though, Brunswick carefully considered location, population, and the presence of competitors in the area of the proposed alleys, to determine whether the alleys themselves were likely to generate revenues sufficient to satisfy the contract obligations.

Based on this evaluation, and aware that the Waxmans were successful businessmen who had heretofore successfully operated bowling lanes, Brunswick anticipated that the Waxmans would continue their initial success in the rapidly growing recreational bowling market, and knowingly accepted the no-asset Construction Corp. as obligor on a series of conditional sale contracts. Between December 1960 and August 1962, Brunswick and the Construction Corp. executed these conditional sale contracts, signed by the Waxmans not as individuals but as officers of the corporation, for the purchase of Brunswick's equipment to outfit five new bowling alleys. The sale contracts contained a statement indicating that the owners of the real property upon which the bowling equipment was to be located were Harry and Sydney W. Waxman. The

---

1. This action is a result of the consolidation of an action instituted in the Southern District of New York, filed in 1966, and a similar action instituted in this district, filed in 1970. Upon the death of Sydney W. Waxman in 1967, his Executors were substituted as named defendants.

five new alleys, of which only the last two concern us, were Cross Bay Bowling Lanes, Van Wyck Bowling Lanes, Gun Post Bowling Lanes, Bruckner Lanes, and Turnpike Lanes.

## Modus Operandi

It was the modus operandi adopted by the Waxmans after the contracts were signed that is the focus of Brunswick's complaint. Although the Construction Corp. was signatory and obligor on the conditional sale contracts, the corporation did not actually operate the bowling alleys. Instead, operation of the five alleys, and their Brunswick equipment, was from the outset conducted by Harry and Sydney W. Waxman as partners. The Waxmans formed five separate partnerships, one corresponding to each alley, which operated the Brunswick equipment. In addition these partnerships (not the Construction Corp.) owned and operated the other non-Brunswick equipment and fixtures in the alleys, including a bar and restaurant at each alley, and owned or leased the real estate on which the alleys were located. All of the licenses and permits obtained in connection with the alleys, including liquor licenses, and licenses to maintain a bowling alley were obtained by the Waxmans in their individual and partnership names. The Waxmans and their partnerships paid no rent to the Construction Corp. for the use of the Brunswick equipment, and in turn charged the Construction Corp. no rent for use of the premises (which they owned) on which the alleys were run. It was abundantly clear that the Construction Corp. was not acting as agent for the Waxmans.

Daily receipts from each of the five alleys were temporarily deposited in individual bowling alley accounts, then pooled in a central Waxman enterprises bank account (subsequently converted into the Great American Bowling Centers' account). Funds in this central bank account were then disbursed as necessary, to meet the operating expenses of the respective alleys. While daily operating expenses were paid directly from the central bank account, payments to Brunswick under the conditional sale contracts were made from checking accounts maintained in the name of the Construction Corp. Prior to each payment, the exact amount due on that installment was transferred from the central bank account to the Construction Corp. account and then withdrawn by a check payable to Brunswick. From time to time, when funds in the central bank account were insufficient to cover payments to Brunswick, the Waxmans would advance their own funds to the Construction Corp. account to meet the installment due.

The transfer of funds into and out of its bank account for payments to Brunswick was for all intents and purposes the Construction Corp.'s only corporate activity. The Construction Corp., whose minutes books, stock certificate books, and stock ledgers are blank, elected no directors, held no stockholders' or directors' meetings, adopted no by-laws, and issued no stock. The Construction Corp. passed no resolutions authorizing the conditional sale contracts or authorizing the operation of its bowling equipment, by the Waxman partnerships. The Construction Corp. did file corporate income tax returns with the Internal Revenue Service, and filed New York State Corporation Franchise Tax Reports. However, all these returns show the Construction Corp. as inactive, with no income and only nominal assets and liabilities. None of these returns reports the Brunswick equipment as a corporate asset, and none reports the conditional sale contracts as corporate liabilities.

## 1963 Extension Agreements

Between 1961 and 1963, funds were transferred from the central bank account to the Construction Corp. account to make payments to Brunswick. In January 1963, the central banking function was assumed by a newly formed no-asset corporation, Great American Bowling Centers, Inc. ("GABC"), which continued to make transfers to the Construction Corp. account. Initially, these transfers were sufficient to meet installments due Brunswick. However, the bowling alleys had begun to experience cash flow difficulties in late 1962 and

by the end of the first quarter of 1963 the GABC account lacked sufficient funds to meet the installments. As a result, the Construction Corp. became delinquent in making payments to Brunswick.

To avoid forfeiture of the bowling equipment, Sydney W. Waxman, as secretary of the Construction Corp., contacted Brunswick, and initiated negotiations regarding an extension of the schedule of payments due under the conditional sale contracts. During these negotiations, Brunswick became aware, for the first time, of GABC (which it believed to be a trade name for the Construction Corp.'s bowling operations). After examining GABC's pro forma balance sheets Brunswick realized that there was a substantial cash flow shortage in the Construction Corp.'s bowling operations. Brunswick agreed that an extension of the payment schedule would ease the cash flow deficiency, but concluded that the Construction Corp.'s assets, consisting entirely of Brunswick's own equipment, were insufficient collateral to secure an extension of the conditional sale contracts. Consequently, Brunswick offered to grant an extension, but only on condition that additional security be provided. The security which Brunswick sought was the formation of a new corporation, with assets of two to three million dollars, which would guarantee the Construction Corp.'s obligation. The Waxmans declined to form such a corporation, and as alternative security offered to form five separate corporations, one corresponding to each of the five bowling alleys, with a combined net worth of one million dollars. Although these five corporations were to have assets of one million dollars, most of this actually consisted of bowling equipment on which Brunswick already had a lien, and in effect the proposed agreement gave Brunswick only $375,000 in additional non-Brunswick equipment as security for all five lanes.

Brunswick reviewed and approved the Waxmans' offer as the basis for an extension agreement. Accordingly, in June 1963, the Waxmans formed five new no-asset corporations, one corresponding to each alley.

Brunswick then approved the transfer by the Construction Corp. of its equity in each alley's Brunswick equipment to the corresponding newly formed corporation. Under these transfers of equity and accompanying extension agreements, all executed in June 1963 and signed by the Waxmans as officers, each corporation assumed the payment obligations on the Brunswick equipment in its alley.

Although the Construction Corp. remained nominally liable under the original contracts, Brunswick, by approving the transfers of equity in the bowling equipment, permitted the Construction Corp. to divest itself of the only asset it had with which to satisfy that liability. The five new corporations did receive title to the Brunswick equipment, but did not receive the $375,000 of non-Brunswick assets which were to be included in their one million dollar net worth. Title to these assets was held by the partnerships, and contrary to the Waxmans' promise, was never transferred to the newly formed corporations.[2]

Shortly after the transfers of equity and extension agreements had been completed, Brunswick abandoned the protection it had in the cross-default provisions in the original conditional sale contracts subjecting each alley's equipment to the obligations of all the other alleys. This release was predicated upon a representation by the Waxmans' controller, Sydney Mazur, that the alleys' liquor licenses would be in jeopardy under state law if the corporations remained subject to cross-default liability. Mazur did not reveal, however, that the liquor licenses were not, as he implied, in the names of the corporations, but were in fact held by the partnerships.

### Default of Bruckner and Pike Lanes

Following execution of the 1963 extension agreements and transfers of equity, operation of the bowling alleys continued as it had previously. The five Waxman partnerships which had run the five alleys continued to do so, forwarding the proceeds of operations to GABC. The only change in

---

2. Failure of the Waxmans to perform this promise is not involved in this action.

GABC's procedures was in making transfers to accounts in the names of the five individual corporations, rather than to the Construction Corp. account, for payments to Brunswick. All five corporations formed by the Waxmans were operated in exactly the same manner. Three of these new corporations were able to satisfy their obligations under the extension agreements, but two, Bruckner Lanes, Inc. and Pike Lanes, Inc., were not, and it is their defaults which form the basis for this action.

All five lanes, including Bruckner Lanes, Inc. and Pike Lanes, Inc., were as inactive as the Construction Corp. had been. There is no record in the corporate minute books of either corporation that directors were ever elected or that meetings of shareholders or directors were ever held. Nor is there any evidence that by-laws were ever adopted or that stock was actually issued in either corporation. In the same manner as the Construction Corp. tax returns, Bruckner Lanes' and Pike Lanes' federal and state corporate tax returns indicate that the corporations were inactive. These tax returns report no income, no expenditures other than payments of New York State Corporation Franchise taxes, and list only nominal assets and liabilities, which do not include the Brunswick equipment or the obligations under the conditional sale contracts.

Although the 1963 extension agreements were intended to ease the cash flow deficiency being experienced by the Construction Corp.'s lanes, both the Bruckner Lanes and Turnpike Lanes partnerships continued to experience a decline in revenues, and by late 1965 both corporations, Bruckner Lanes, Inc. and Pike Lanes, Inc., were in substantial default. Brunswick demanded that the defaults be cured, and threatened to institute legal proceedings. In February 1966 Brunswick did institute a state court action against Pike Lanes, Inc. and the Waxmans individually for repossession of its equipment at Turnpike Lanes, in response to which negotiations for a new extension agreement were undertaken between representatives of Brunswick on the one hand, and representatives of the Construction Corp., Pike Lanes, Inc., and the Waxmans on the other.

*The 1966 Extension Agreement*

In September 1966 an agreement was reached, extending the schedule of payments due from Pike Lanes, Inc. Under this extension agreement, Pike Lanes agreed to pay all defaulted installments, an additional finance charge was added to the payment balance, and the Waxmans agreed to give a personal guarantee for payments due from Pike Lanes, Inc. during the next two years.

The parties were unable to reach a similar extension agreement regarding Bruckner Lanes, and in October 1966 the Waxmans, as owners of the real property on which Brunswick's equipment was located, demanded that Brunswick remove the equipment. Accordingly, an agreement was reached between Brunswick, Bruckner Lanes, Inc. and the Construction Corp. detailing the procedure for repossession of Brunswick's equipment. Under this agreement Brunswick conducted public auctions in October and November 1966, at which it, as the highest bidder, purchased Bruckner's lanes, pinsetters, and related equipment. The price paid was considerably below the contract price, and a substantial deficiency remained.

*1970 Pike Lanes Foreclosure*

Between 1966 and 1970 the Waxman partnership continued to operate Turnpike Lanes and payments were made in accordance with the 1966 extension agreement, but due to a continuing decline in revenues, by mid-1970, Pike Lanes, Inc. was once again in substantial default. Since no additional extension of payments was agreed to, Brunswick, in July 1970, repossessed its equipment from Pike Lanes, Inc. at a public auction following which a substantial deficiency remained due.

*Reconstructed Financial Statements*

As noted above, neither the Construction Corp., Bruckner Lanes, Inc., nor Pike Lanes, Inc. ever reported in their tax returns the

Brunswick bowling equipment as a corporate asset, or obligations under the conditional sale contracts as corporate liabilities. However, the Waxman partnerships which operated Bruckner and Turnpike Lanes, did treat this equipment and the related purchase obligations as partnership assets and liabilities for bookkeeping and tax purposes. Although they had no ownership interest in the Brunswick equipment and were not signatories to the sale contracts and accompanying notes, the Bruckner Lanes and Turnpike Lanes partnerships both filed tax returns which reported the Brunswick equipment as a partnership asset, took depreciation on the equipment, reported the conditional sale obligations as their own, and reported the interest paid or accrued on the contract balance.

Throughout the entire period that these Waxman partnership tax returns were filed, the returns, and the balance sheets and ledgers from which they were drawn indicate that Bruckner Lanes and Turnpike Lanes were operating at a loss. As sole members of the Bruckner Lanes and Turnpike Lanes partnerships, Harry and Sydney W. Waxman claimed the partnership losses on their own individual personal income tax returns to offset their personal income from other sources. Between 1961 and 1970, Harry Waxman realized over $400,000 in personal tax savings as a result of claiming these losses. Sydney W. Waxman, as an equal partner, claimed an equal share of the partnership losses, and realized comparable tax savings between 1961 and his death in 1967. Additional inheritance tax savings were subsequently realized by Sydney W. Waxman's estate.

Although the evidence demonstrates that Bruckner Lanes and Turnpike Lanes were operated at a loss, there is no evidence that this was due to misdeeds or mismanagement by the Waxmans. Instead, the losses suffered by these lanes appear to have been a result of a general decline in the popularity of bowling in the years following execution of the original conditional sale contracts.[3] Be that as it may, there was no evidence of use of corporate assets or the corporate form to the detriment of the creditors. The only benefit the Waxmans as individuals realized from their operation of Bruckner Lanes and Turnpike Lanes was in personal tax savings. However, given the fact that neither the Construction Corp., Bruckner Lanes, Inc., nor Pike Lanes, Inc. had any gains against which to offset their losses, reporting these losses on the corporate tax returns would have provided no benefit to these corporations.

At the court's request, hypothetical profit and loss statements for Bruckner Lanes, Inc. and Pike Lanes, Inc. were constructed by defendants' accountant, predicated upon the Waxmans' individual and partnership tax returns. These profit and loss statements were drawn from the partnership and individual tax returns after adjustment to eliminate expenses attributable to the land and buildings owned by the Waxmans, and to add the fair market rent for the premises occupied by the bowling lanes. In so doing, straight line depreciation was applied. The results after the adjustments indicate that even if the Construction Corp., Bruckner Lanes, Inc. and Pike Lanes, Inc. had operated the bowling equipment, they would have sustained losses for the years in question. Eliminating all deductions for depreciation, Bruckner and Pike would still show losses for the bowling operations.

## DISCUSSION

Brunswick's basic claim in this action is that the Waxmans operated Brunswick's equipment in their individual capacities and in complete disregard of the corporations they had formed. Accordingly, Brunswick contends, the Waxmans have abandoned the protection of limited liability those corporations would have otherwise provided, and have, as a matter of law, rendered themselves personally liable for their corporations' obligations.

Historically the corporate form has for centuries been used for various diverse governmental and private purposes,

---

3. "In the early 1960's, the bowling industry went into a sharp decline." *Brunswick Corp.* *v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 479, 97 S.Ct. 690, 693, 50 L.Ed.2d 701 (1977).

and today it has become a key institution in the American free enterprise system. *See* H. Henn, Law of Corporations, 11–25 (2d ed. 1970). This concept has, among others, three basic objectives, to provide (1) limited liability, (2) perpetual existence, and (3) transferability of shares. Ballantine on Corporations, 2–6 (1946); C. L. Israels, Corporate Practice, 7–12 (1963). As stated in *Bartle v. Home Owners Co-operative, Inc.,* 309 N.Y. 103, 127 N.E.2d 832 (1955), "the law permits the incorporation of a business for the very purpose of escaping personal liability." *See also Natelson v. A. B. L. Holding Co.,* 260 N.Y. 233, 183 N.E. 373 (1932); *Rapid Tr. Subway Constr. Co. v. City of New York,* 259 N.Y. 472, 182 N.E. 145 (1932). However, when the privilege of incorporation has been abused, it is necessary to "pierce the corporate veil" to "prevent fraud or to achieve equity." *International Aircraft Trading Co. v. Manufacturers Trust Co.,* 297 N.Y. 285, 79 N.E.2d 249 (1948). As early as 1905 Judge Sanborn in *United States v. Milwaukee Refrigerator Transit Co.,* 142 F. 247, 255 (C.C.E.D.Wis. 1905), observed: "when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons."

■ The circumstances under which the court should disregard the corporate fiction are not always clear and it is difficult, if not impossible, to formulate a precise and categorical definition applicable to all situations, *see Berkey v. Third Ave. Ry. Co.,* 244 N.Y. 84, 155 N.E. 58, 61 (1926), each case being *sui generis.* The burden, however, in each case rests upon the plaintiff to establish that there is a basis which serves for disregard of the corporate form. *Coryell v. Phipps,* 128 F.2d 702, 704 (5th Cir. 1942), *aff'd,* 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943).

*The Instrumentality Rule*

■ New York courts, whose rules we must follow, have advanced a variety of theories to define the particular circumstances and factors which justify disregard of the corporate entity. Some have applied the theory of agency, holding that a corpo-

ration may be so dominated and controlled by its stockholders as to become a mere agent, acting for the stockholders as principals. *See e. g. Berkey v. Third Ave. Ry. Co., supra; Majestic Factors Crop. v. Latino,* 15 Misc.2d 329, 184 N.Y.S.2d 658 (1959). "No conceptual problems are involved where liability is imposed upon shareholders under conventional theories of agency or tort law—independently of any theory of corporation law or of the corporate entity." 2 G. Hornstein, Corporation Law and Practice, 263 (1959). But the agency theory is not always available and as Mr. Justice Dore explained in *Lowendahl v. Baltimore & O. R. Co.,* 247 App.Div. 144, 287 N.Y.S. 62, *aff'd,* 272 N.Y. 360, 6 N.E.2d 56 (1936), "any severely logical application of agency rules would destroy the protection afforded stockholders by incorporation." For if all systems of control exercised over a corporation by those who own it are illegal, then "the rule of the separate entity and responsibility of corporations for their own acts and contracts is swallowed up in the exception." *Id.* This is particularly true when the corporation is owned and controlled by one or two persons. Thus, except in case of express agency, estoppel, or tort, *Lowendahl* advanced the so-called "instrumentality" rule as a practical and effective "theory for breaking down corporate immunity when equity so requires." 287 N.Y.S. at 75.

■ Under the "instrumentality" rule, the factors which determine whether the corporate veil should be withdrawn are (1) domination and control over the corporation by those who are to be held liable which is so complete that the corporation has no separate mind, will, or existence of its own; (2) the use of this domination and control to commit fraud or wrong or any other dishonest or unjust act; and (3) injury or unjust loss resulting to the plaintiff from said control and wrong. 287 N.Y.S. at 76. *See also Fisser v. International Bank,* 282 F.2d 231 (2d Cir. 1960). While this rule emerged in the parent-subsidiary context, some of the same criteria have been carried over in determining whether to pierce the corporate veil in other contexts. For instance, in this case the Waxmans disregarded their corpo-

rations after the signing of the contracts so that thereafter they did not function as active corporations. The corporations were acting for themselves and not as agents for the Waxmans in acquiring title to the property and in incurring liability for the purchase price. Subsequently, the corporations did receive moneys from the Waxmans in order to meet their payments to Brunswick. Since, however, we find that there was no misappropriation of corporate assets of profits, and consequently no fraud or wrong to Brunswick, we do not find that all the criteria of the instrumentality rule for imposing personal liability are present. We must therefore invoke some different criteria if we are to disregard the corporate form. Under such circumstances, the overwhelming weight of authority requires at least some type of abuse of the corporate concept which is the cause of the injury to third parties.

*Personal Conduct of Corporate Business*

■■ Absent special circumstances, limited personal liability cannot be effectuated simply by the act of incorporation. The protection extends only to those transactions which are engaged in by a corporation, for its own purposes, in fact as well as in name. If, as Judge Fuld observed in *Walkovszky v. Carlton,* 18 N.Y.2d 414, 418, 276 N.Y.S.2d 585, 588, 223 N.E.2d 6, 8 (1966), "the corporation is a 'dummy' for its individual stockholders who are in reality carrying on the business in their personal capacities for purely personal rather than corporate ends" then stockholders must be personally liable and financially responsible as well. *See, e. g. Port Chester Elec. v. Atlas,* 40 N.Y.2d 652, 389 N.Y.S.2d 327, 357 N.E.2d 983 (1976); *African Metals Corp. v. Bullowa,* 288 N.Y. 78, 41 N.E.2d 466 (1942); *Natelson v. A. B. L. Holding Co., supra; Quaid v. Ratkowsky,* 183 App.Div. 428, 170 N.Y.S. 812, aff'd, 224 N.Y. 624, 121 N.E. 887 (1918); *P. S. & A. Realties v. Lodge Gate Forest,* 205 Misc. 245, 127 N.Y.S.2d 315 (Sup.Ct.1954); *Majestic Factors Corp. v. Latino, supra.* Fraud or other wrongful purpose is not a necessary element. For example, a failure to observe corporate formalities coupled with inadequate capitalization

has frequently been cited as a basis for disregarding the corporate entity and imposing individual liability where such facts are causally connected with the injury. *See, e. g. Anderson v. Abbott,* 321 U.S. 349, 64 S.Ct. 531, 88 L.Ed. 793 (1944); *DeWitt Truck Brokers v. W. Ray Flemming Fruit Co.,* 540 F.2d 681 (4th Cir. 1976); *Francis O. Day v. Shapiro,* 105 U.S.App.D.C. 392, 267 F.2d 669 (1959); *Mull v. Colt,* 31 F.R.D. 154 (S.D.N.Y.1962).

■ Some courts have held that unjust enrichment alone may justify imposition of personal liability on those who have conducted ostensibly corporate business in their individual capacities. *See, e. g. DeWitt Truck Brokers v. W. Ray Flemming Fruit Co., supra; Francis O. Day v. Shapiro, supra; Allman Hubble Tugboat v. Reliance Devel. Corp.,* 193 Wash. 234, 74 P.2d 985 (1938). However, we have been unable to find any New York authority to this effect. But cf. *Bartle v. Home Owners Co-operative, Inc., supra.* Another example of disregarding corporate formalities is where stockholders have represented that they would be liable for their corporations' obligations, and are therefore estopped from denying liability. *See, e. g. Weisser v. Mursam Shoe Corp.,* 127 F.2d 344 (2d Cir. 1942); *Quaid v. Ratkowsky, supra.* Cf. *Wagner v. Manufacturers Trust Co.,* 237 App.Div. 175, 261 N.Y.S. 136 (1932). Likewise stockholders will be liable if they deprived their corporation of the income and profits required to meet its obligations. As the Court of Appeals observed in *Natelson v. A. B. L. Holding Co., supra,* 260 N.Y. at 238, 183 N.E. at 375, the business of a corporation must be carried on by the corporation "and its profits must be available to meet liabilities, before the individuals may share." It is not merely the disregard of corporate formalities which justifies piercing, but the fact that the stockholders' conduct has caused the creditors' losses which justifies the imposition of personal liability.

*Parties' Contentions*

Brunswick asserts that the Waxmans are liable personally and that the language of *Walkovszky, supra,* and *African Metals, supra,* in effect, establishes a *per se* rule

which imposes liability simply on the basis of a failure to observe the corporate formalities. We find no support for this broad assertion. Actually, *Walkovszky* is not applicable. There the plaintiff was injured when he was run down by a taxicab owned by the defendant-corporation which in turn was wholly owned by the individual defendant as a stockholder. The complaint alleged fraud and that the corporation did not have a separate existence, and charged that its assets were insufficient. The complaint was dismissed because, as Judge Fuld observed, the plaintiff had failed to make any

> 'sufficiently particularized statements' . . . that the defendant . . . and his associates are actually doing business in their individual capacities, shuttling their personal funds in and out of the corporations 'without regard to formality and to suit their immediate convenience.'

18 N.Y.2d 420, 276 N.Y.S.2d 590, 223 N.E.2d 10.

*African Metals, supra,* is also inapposite because there the action was for rescission predicated upon fraud. To accomplish the fraud, the individual defendants organized a corporation with very limited assets and no credit facilities. A sale of nickel cathodes was negotiated in the name of the corporation by the defendants who individually and fraudulently manipulated the sale and retained the purchase money. The court observed that where there is fraud

■ Incorporation does not exempt the individuals from liability for an enterprise which they themselves choose to carry on as individuals independently of the corporation. It cannot be said, as a matter of law, upon this record, that there is no evidence or inferences from evidence that these defendants were not joint venturers dealing personally in this enterprise.

288 N.Y. at 85, 41 N.E.2d at 470.

The Waxmans in defending their actions, insist that they are exempt from personal liability because they do not satisfy all the criteria of the instrumentality rule. We do not believe that this rule is completely applicable to the present circumstances. Although we conclude that the Waxmans' corporations had no separate mind or existence, we also find that these corporations were never sufficiently functional to justify describing them as an instrumentality which committed wrongs causing plaintiff's injury.

### No-Asset Corporations

The transactions between Brunswick and the Waxmans' corporations were much like a common form of real estate transaction in which a "dummy" corporation is established for the sole purpose of taking title and assuming mortgage obligations and thus exempting the sole stockholder from liability. *See In re Childs*, 163 F.2d 379 (2d Cir. 1947), and cases cited therein at 382; *East Asiatic Co., Inc. v. Corash*, 34 A.D.2d 432, 312 N.Y. S.2d 311 (1970). There is no question that the Waxmans employed a no-asset or "straw" corporation to purchase the bowling alleys from Brunswick. Straw corporations have been used for many purposes, such as compliance with state usury or investment laws, *Leader v. Dinkler Mgt. Corp.*, 20 N.Y.2d 393, 283 N.Y.S.2d 281, 230 N.E.2d 120 (1967); *Jenkins v. Moyse*, 254 N.Y. 319, 324, 172 N.E. 521 (1930), facilitation of the conveyance of property, *Harrison Property Mgmt. Co. v. United States*, 475 F.2d 623, 201 Ct.Cl. 77 (1973), *cert. denied*, 414 U.S. 1130, 94 S.Ct. 868, 38 L.Ed.2d 754 (1974); *Moline Properties, Inc. v. Commissioner of Internal Revenue*, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943), and insulation of principals from liability, *Given v. Commissioner of Internal Revenue*, 238 F.2d 579 (8th Cir. 1956).

When Brunswick made its initial sale to the Waxman Construction Corp. for the Bruckner and Turnpike Lanes it knew that the land and buildings upon which the lanes and pinsetters were to be erected, were owned by the Waxmans and that the Construction Corp. was a no-asset corporation. Brunswick was under no illusion that the Construction Corp. was an agent for the Waxmans.[4] Although under-capitalization of the bowling operation might under other

---

4. In fact, P. L. Fulvio, Brunswick's major accounts manager, stated in a memorandum to Brunswick's credit committee dated December 2, 1964 that "I reminded Barell [the Waxmans'

circumstances indicate that the corporate form was being used to mislead creditors and should be pierced, *Francis O. Day v. Shapiro, supra; DeWitt Truck Brokers v. W. Ray Flemming Fruit Co., supra,* Brunswick had full knowledge of the lack of capitalization, and consented to it. Brunswick was not misled into doing business with a no-asset corporation and is hardly in a position now to complain that in the absence of any additional assets in that corporation its liability should be shifted to the Waxmans. As the court said in *Hanson v. Bradley,* 298 Mass. 371, 10 N.E.2d 259, 264 (S.J.C.1937):

> The plaintiff was not wronged by the fact that the corporation was organized with a trifling capital and could not live except upon borrowed money; nor by the fact that the lenders insisted upon security. He knew the essential facts and accepted the situation.

*Constructive Notice*

While it is unnecessary to the ultimate disposition of this case, we believe it is important to note that the relationship between Brunswick and the Waxmans was such that it is reasonable to charge Brunswick with constructive notice of the Waxmans' personal operation of the lanes. It is true that Brunswick denies that it knew the Waxmans were personally operating the alleys, but it is also true that the evidence indicates that the ordinary prudent man would have been placed on notice that such operations were being conducted by the Waxmans in person.

When one extends credit to a corporation in the large amounts involved in this case and relies upon that corporation, it is reasonable to assume that he will investigate the corporation's capitalization, its assets and its operations, and that his contract is made on this basis and not on the individual credit of the dominant stockholders. *See DeWitt Truck Brokers v. W. Ray Flemming*

*Fruit Co., supra,* 540 F.2d at 686, n. 13. Apparently it was a matter of no concern to Brunswick in whose name the equipment was being operated, as long as the revenues therefrom were made available for payment of the corporations' obligations to Brunswick. Indeed, it would be hard for an ordinary business man in Brunswick's position to escape the inference under the circumstances that the Waxmans were in fact operating the bowling alleys individually. As stated in *Bierzynski v. New York Central Railroad Company,* 31 A.D.2d 294, 297 N.Y.S.2d 457, 461 (1969), " 'Constructive notice also exists whenever it is shown that reasonable diligence would have produced actual notice.' (42 N.Y.Jur., Notice and Notices, § 3)." *See also* Restatement (Second) of Torts, § 12 (1965). Some evidence charging Brunswick with constructive notice appears from Brunswick's repeated failure to examine the corporate books and records of both corporations when offered.

In 1962 William B. Bremer, an attorney and assistant secretary of Brunswick conferred with the Waxmans and was informed that the Waxmans were suffering a severe cash shortage in the operation of the bowling centers and that the Waxmans were putting money into the operations and were not charging rent. At that time Bremer asked for a *pro forma* financial statement and was given a balance sheet and a profit and loss statement of the Great American Bowling Centers "Waxman Construction Corp. as nominee" but he did not request any substantiation of this financial statement based upon the books. Apparently, it did not seem too important to him whose name or names the equipment was being operated in.[5] In the middle of 1963 Brunswick extended the payment schedule due from Turnpike Lanes which was delinquent at the time. Even then Brunswick did not examine the books to investigate the capitalization or assets of Pike Lanes, Inc.[6] On October 19, 1964, P. L. Fulvio,

attorney] and [Sydney] Waxman that I was not doing business with Waxman but with his corporation. . . ."

**5.** Although Bremer testified that he had no knowledge that the alleys were not operated by

the Construction Corp., he made no effort to find out how the alleys were being operated.

**6.** Bremer did receive a Dun & Bradstreet report, dated September 27, 1963, on the Waxman Construction Corp., but it furnished no financial details and instead erroneously stated

Brunswick's major accounts manager, made a report to the members of the credit department relative to a conference he, Bremer and A. N. Frecker of Brunswick had with the Waxmans and their attorney, Martin C. Barell. Fulvio reported that Barell had stated that the Waxmans were being forced to subsidize the operations from their personal funds and "offered to permit us to examine the books at each and every operation." Even after this offer, which would seem to negative any intent to defraud on the Waxmans' part, Brunswick made no examination of the books. In fact, on May 3, 1966, A. M. Rasmussen of Brunswick's installment credit department, in a memorandum to M. E. McGrath of the credit committee, made the following statement: "Turnpike Lanes, Inc. nor Waxman Construction itself has any real value [and] therefore the outcome of legal action is questionable." Later, in September 1966, when Turnpike began to default, another extension agreement was entered into by Brunswick and the Waxmans.[7] At this time Brunswick sought full personal guarantees from the Waxmans of all sums due under the contracts. The Waxmans refused to provide such guarantees but did agree to a limited two-year personal guarantee. While it does not necessarily follow that a request for personal guarantees indicated knowledge that the Waxmans were not otherwise liable, nevertheless, it is evidence that Brunswick never thought the Waxmans were liable on the basis of corporate agency. Once again Brunswick did not seek an examination of the corporations' books and records.

In sum, we believe that Brunswick should be charged with constructive knowledge that the lanes were operated by the Waxmans individually and not by the corporations.

*No Causal Connection*

■ The decisive factor in this case is that the Waxmans' operation of the bowling alleys did not cause Brunswick's loss and did not defeat Brunswick's expectations with regard to the generation of profits from its equipment. The Waxmans never attempted to strip their corporations of the bowling equipment or its profits, and Brunswick was able to recover its equipment through repossession. The only respect in which Brunswick's expectations were not fulfilled was in the failure of the equipment to generate revenues sufficient to pay the purchase price. However, as we have seen from the partnership tax returns and from the reconstructed profit and loss statements for Bruckner Lanes and Turnpike Lanes, this failure resulted not from the manner in which the business was conducted, but from the fact that consistent with results in the industry as a whole, instead of producing profits, the lanes produced losses. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). If there had been operating profits which the Waxmans had appropriated to themselves, or shuttled to and from their other enterprises, or if they had deceived Brunswick in extending its credit, a different result would emerge and the Waxmans would be subject to personal liability. But the evidence before us shows no such facts and, on the contrary, demonstrates that there was no causal connection between the fact that the Waxmans conducted business individually and the contract losses suffered by Brunswick. Absent such a causal link, no principle of honesty, equity or fairness would justify shifting those losses to the Waxmans by withdrawing the veil from their corporations. *See Bartle v. Home Owners Co-operative, Inc., supra.* Here, Brunswick "has been disappointed, not in failing to get the promise which it supposed, but in its performance, a

---

that the Construction Corp. was a general contractor doing building on its own account and for affiliates, and having twenty bank accounts. This report was received on December 4, 1963 and had no effect on the 1963 extension agreements executed in June 1963.

**7.** Brunswick granted this extension to Pike Lanes, Inc. despite the fact that Brunswick had already filed an action against Bruckner Lanes and the Waxmans alleging that the Waxmans were conducting the bowling operations in their individual rather than corporate capacities.

risk inherent in any contract." *Kingston Dry Dock Co. v. Lake Champlain Transp. Co.*, 31 F.2d 265, 267 (2d Cir. 1929). *See also Hellenic Lines Limited v. Winkler*, 249 F.Supp. 771, 778 (S.D.N.Y.1966). On the facts before us, we find that "[n]o rule of common sense or common justice is . . . violated" and "[n]o wrong or fraud is shielded . . ." by refusing to pierce the corporate form and exempting the Waxmans from liability with respect to the three corporations. *Halsted v. Globe Indemnity Co.*, 258 N.Y. 176, 179, 179 N.E. 376, 377 (1932).

### Waxmans' Tax Returns

Plaintiff relies almost entirely as a predicate for recovery upon the fact that throughout the entire period Waxmans' partnerships indicated on their books, balance sheets, ledgers and income tax returns that they were the owners of the Brunswick equipment and were obligated to pay the liabilities due on the conditional sale contracts. At the same time, the Waxmans reported Waxman Construction Corp., Bruckner Lanes, Inc. and Pike Lanes, Inc. as being inactive corporations and as having no income or property. However, while all of this is true in the Waxmans' scheme to defraud the Government, there is no evidence that in their relationships with Brunswick the Waxmans ever claimed personal ownership of the equipment or admitted that they were obligated under the conditional sale contracts. In fact, Brunswick did not know of the Waxmans' statements and representations on their partnership and individual tax returns until after the commencement of discovery proceedings following institution of this action.

The truth of the matter is that in making up their personal income tax returns, the Waxmans combined the corporate ownership of the bowling equipment with their personal ownership of the land and buildings upon which the lanes were located. In so doing they were able to personally claim depreciation and other deductions and losses attributable to the operations of the bowling equipment of both Bruckner Lanes and Turnpike Lanes as their own personal losses, thereby decreasing their personal income tax liability otherwise attributable to income and profits made in their other enterprises. By this fraudulent procedure of claiming the corporations' losses as their own, both of the Waxmans realized substantial personal income tax savings, and the estate of Sydney W. Waxman realized inheritance tax savings. Fraud there was but the victim of this fraud was not Brunswick but the United States Government.

There is no question that both Waxmans realized an unjust enrichment by claiming on their personal income tax returns the corporations' deductions as their own. Unjust enrichment there was, but it was not at the expense of Brunswick but at the expense of the United States. As far as Brunswick was concerned, the profits available for payment of the obligation remained the same regardless of who took the income tax deductions. Therefore neither the fraud nor the unjust enrichment at the expense of the Government provides justification for disregarding the corporate forms of Waxman Construction Corp., Bruckner Lanes, Inc., or Pike Lanes, Inc., in order to hold the Waxmans personally liable to Brunswick.

The result is that the complaint should be and hereby is dismissed and judgment entered for the defendants.

SO ORDERED.