HORTICULTURAL ENTERPRISES CORPORATION, Plaintiff,

v.

ALLSTATE INSURANCE COMPANY, an Illinois Corporation, Defendant.

ALLSTATE INSURANCE COMPANY, an Illinois Corporation, Counterclaimant,

v.

HORTICULTURAL ENTERPRISES COR-PORATION, a California Corporation, and Joe B. Leatherwood, an Individual, Counterclaim-Defendants.

No. CV 78–2405–AAH (SX).

United States District Court, C. D. California.

Sept. 28, 1979.

William M. Shernoff, A Professional Corp., by David Lipsky, Claremont, Cal., for plaintiff.

Munger, Tolles & Rickershauser, by Ronald K. Meyer, Los Angeles, Cal., for defendant.

FINDINGS OF FACT AND CONCLU-SIONS OF LAW FOR DEFENDANT AND COUNTERCLAIMANT ALL-STATE INSURANCE COMPANY

HAUK, District Judge.

This matter came on for hearing on September 17, 1979, on the Motion of Defendant and Counterclaimant Allstate Insurance

Company ("Allstate") pursuant to Rule 56 of the *Federal Rules of Civil Procedure* for summary judgment on the First Amended Complaint filed by Horticultural Enterprises Corporation ("Horticultural") and, alternatively, for partial summary judgment on the claim for punitive damages in the First Amendment Complaint; and for summary judgment on the Counterclaim filed by Allstate against Horticultural and against Joe B. Leatherwood ("Leatherwood"). The Court, having heard oral argument by counsel and having considered all memoranda filed in support of and in opposition to the Motion, all affidavits in support of and in opposition to the Motion and all exhibits thereto, and all of the other pleadings and documents on file herein, makes the following findings of fact and conclusions of law:

## I. *FIRST AMENDED COMPLAINT*

### A. *Findings of Fact*

1. In the First Amended Complaint, Horticultural seeks compensatory and punitive damages from Allstate for Allstate's alleged breach of its duty of good faith and fair dealing under a liability insurance policy issued by Allstate (the "liability insurance policy").

2. During the period from October 1, 1975 through March 1, 1978, Horticultural, a California corporation, was engaged in the business of providing maintenance and landscaping services.

3. Allstate, an Illinois corporation, is primarily engaged in the business of writing automobile, general liability and workers' compensation and related insurance.

4. The undisputed facts establish that there is no evidence that Allstate acted maliciously, or with an intent to oppress, or consciously to disregard Horticultural's rights under the liability insurance policy.

5. All statements contained in the Conclusions of Law set forth in section I(B) below which are deemed to be factual in nature are so found.

### B. *Conclusions of Law*

1. The Court has diversity jurisdiction of the First Amended Complaint pursuant to 28 U.S.C. § 1332.

2. There are no material issues of fact remaining to be litigated with respect to Horticultural's claim for punitive damages in the First Amended Complaint.

■ 3. Horticultural is not entitled to recover punitive damages from Allstate.

4. All statements contained in the Findings of Facts set forth in section I(A) above which are deemed to be Conclusions of Law are so found.

## II. *COUNTERCLAIM*

### A. *Findings of Fact*

1. In its Counterclaim, Allstate seeks recovery from Horticultural and from Leatherwood of the premiums owing under a workers' compensation insurance policy and under a business liability insurance policy issued by Allstate.

2. On October 1, 1968, Leatherwood began doing business as a landscape contractor under the trade name "Joe B. Leatherwood dba Horticultural Services Company," a sole proprietorship.

3. On July 9, 1975, the sole proprietorship was incorporated into "Horticultural Enterprises Corporation" ("Horticultural"). The corporation began doing landscape maintenance and installation business on October 1, 1975.

4. Since the date of incorporation, Leatherwood and his wife have been Horticultural's only shareholders. Leatherwood's wife was never involved in the day-to-day operation of the corporation. On November 20, 1976, Leatherwood became Horticultural's sole shareholder.

5. On the date of incorporation, Leatherwood, Leatherwood's wife, Michael Sherwin and Mary Ann Wisner (also known as "Mary Ann Keys" and "Mary Ann Hempy") were named as Horticultural's directors. Ms. Wisner ("Hempy") and Mr. Sherwin resigned as directors effective February 1, 1977, and were not replaced.

6. During the approximately three-year period from Horticultural's incorporation on July 9, 1975 through its termination of business on or about March 1, 1978, the corporation's Board of Directors met no more than four times.

7. Leatherwood ran Horticultural in the same manner as he had run his sole proprietorship.

8. Whenever Horticultural was in need of cash, Leatherwood advanced his personal funds to the corporation. These advances were never presented or approved by Horticultural's Board of Directors, although such approval was required by Horticultural's By-Laws (the "By-Laws"), and were not evidenced by any writing, other than a deposit slip or a cancelled check. Leatherwood's advances to the corporation were repaid to Leatherwood when Leatherwood himself felt that Horticultural had funds available. The making of these repayments was not presented to the Board of Directors for approval.

9. In October, 1976, Leatherwood borrowed $25,000 from his parents which Leatherwood deposited in an account designated as the "nursery account," and then advanced to Horticultural. Pursuant to the agreement between Leatherwood and his parents, the $25,000 was to be considered as an "investment" in Horticultural, with payment of interest only. In the event the investment appeared questionable, Leatherwood was to execute a personal promissory note to his parents. Leatherwood executed such a note and personally has repaid part of the $25,000.

10. In 1977, Leatherwood advanced $6,000 to Horticultural from the personal savings account maintained by Leatherwood and his wife. This advance was not evidenced by any writing, except a withdrawal slip and a deposit slip.

11. In early December, 1977, Leatherwood advanced approximately $20,000 of his personal funds to Horticultural. On December 30, 1977, Leatherwood instructed Ms. Herkelrath to issue a check to Leatherwood on one of Horticultural's bank accounts to repay $15,000 of that advance.

Ms. Herkelrath did so. Whether or not the $20,000 should be advanced or the $15,000 repayment made was never presented to Horticultural's Board of Directors for approval.

12. Without obtaining the approval of Horticultural's Board of Directors as required by the By-Laws, Leatherwood personally determined the salary he received from the corporation. For the six months ending December 31, 1977, Leatherwood decided to decrease his annualized salary by $13,000, because he believed Horticultural needed the money. Leatherwood did not present the matter of his decrease in compensation to the Board of Directors for decision.

13. Leatherwood himself transferred corporate funds to his own use, without approval of Horticultural's Board of Directors, including $6,000 prior to June 30, 1976 and advances to Leatherwood from Horticultural in the amounts of $1,350, $150 and $500 after that date.

14. Leatherwood's personal credit cards were used to pay both corporate expenses and Leatherwood's personal expenses.

15. Leatherwood failed to maintain a distinction between Horticultural's bank accounts and Leatherwood's personal accounts. The account designated as the "nursery account" was maintained in the name of "Joe B. Leatherwood." This account was sometimes described by Leatherwood as his "personal account" and sometimes as a "corporate account." However, transfers from the nursery account to bank accounts maintained in Horticultural's name were recorded on Horticultural's books as personal loans from Leatherwood to the corporation.

16. On or about February 28, 1978, Horticultural stopped doing business and certain of its assets were sold to a third party. The decision to sell Horticultural's assets was made by Leatherwood personally, without a meeting or a waiver of meeting of the Board of Directors, although required by the By-Laws.

17. Upon Horticultural's termination of business, Leatherwood personally assumed a contract previously entered into between Horticultural and a third party for Horticultural to perform landscape construction at a location known as Oakridge Mall. Leatherwood did not pay anything to Horticultural for the contract. Leatherwood's assumption of the contract was not approved by Horticultural's Board of Directors or by any Court. The contract was an asset of Horticultural. Since assumption of the contract, Leatherwood personally has received $299,043.28 pursuant to the contract.

18. During the entire period Horticultural did business, Horticultural was inadequately capitalized.

19. At incorporation, the assets of the sole proprietorship were transferred by Leatherwood to Horticultural in exchange for stock in the corporation. No other assets were transferred to Horticultural at incorporation.

20. From the time Horticultural began doing business, Leatherwood was required to, and did, advance his personal funds to the corporation whenever Horticultural needed cash to pay its debts.

21. Leatherwood instructed Ms. Herkelrath to issue Horticultural's payroll checks each payday, whether or not Horticultural had sufficient monies in its payroll account to cover the checks. Payroll checks were so issued by Horticultural. During the nine months prior to September 30, 1977, at least 29 of Horticultural's payroll checks bounced. During this same period, 614 of Horticultural's checks at Security Pacific National Bank, Upland, California were received by the Bank at a time when Horticultural had insufficient funds to pay the checks.

22. Horticultural did not have sufficient funds to cover its September 30, 1977 payroll, even had the payroll account not been garnished.

23. For the fiscal period ending June 30, 1976, the first period Horticultural operated as a corporation, Horticultural incurred overdue federal payroll taxes in the amount of $35,403.67, in addition to a penalty for late payment of $2,671.33.

24. On or about October 1, 1975, Horticultural sought workers' compensation insurance from Allstate for coverage of the employees of Horticultural's maintenance and landscape business.

25. On or about October 1, 1975, Allstate agreed to write the workers' compensation insurance and issue its policy No. 04 736 432 WC (hereinafter the "workers' compensation policy").

26. Following close of the policy period extending from October 1, 1976 to October 1, 1977, and pursuant to the terms of the workers' compensation policy, Allstate performed an audit of Horticultural's payroll for this period to determine Horticultural's premium obligation under the workers' compensation policy for the period.

27. Based on this audit, Horticultural's total premium obligation under the workers' compensation policy for the period from October 1, 1976 to October 1, 1977, was $35,064.00. Horticultural had previously made premium payments of $27,785.00 to Allstate. Therefore, Horticultural is indebted to Allstate for this period in the amount of $7,279.00.

28. On or about March 1, 1978, Horticultural terminated coverage under the workers' compensation policy.

29. Following termination of coverage, Allstate performed an audit of Horticultural's payroll to determine Horticultural's premium obligation under the workers' compensation policy for the coverage period from October 1, 1977 to March 1, 1978.

30. Based on this audit, Horticultural's total premium obligation under the workers' compensation policy for the period from October 1, 1977 to March 1, 1978, was $22,842.00. Horticultural had previously made premium payments of $11,565.16 to Allstate. Therefore, Horticultural is indebted to Allstate for this period in the amount of $11,176.84.

31. On or about October 1, 1975, Horticultural sought business liability insurance

from Allstate for coverage of the maintenance and landscape business operated by Horticultural.

32. On or about October 1, 1975, Allstate agreed to write the business liability insurance and issued its policy No. 04 739 T 172 BPA (the "business liability policy.")

33. Following close of the policy period extending from October 1, 1976 to October 1, 1977, and pursuant to the terms of the business liability policy, Allstate performed an audit of Horticultural's operations to determine Horticultural's premium obligation under the business liability policy for this policy period.

34. Based on this audit, Horticultural's premium obligation under the business liability policy for the period from October 1, 1976 to October 1, 1977, was $26,329.00. Horticultural had previously made premium payments of $24,109.40 to Allstate. Therefore, Horticultural is indebted to Allstate for this period in the amount of $2,219.60.

35. On or about March 1, 1978, Horticultural terminated coverage under the business liability policy.

36. Following termination of coverage, Allstate performed an audit of Horticultural's operations to determine Horticultural's premium obligation under the business liability policy for the period from October 1, 1977 to March 1, 1978.

37. Based on this audit, Horticultural's total premium obligation under the business liability policy for the period from October 1, 1977 to March 1, 1978 was $13,777.00. Horticultural had previously made premium payments of $10,610.05 to Allstate. Therefore, Horticultural is indebted to Allstate for this period in the amount of $3,166.95.

38. All statements contained in the Conclusions of Law set forth in Section II(B) below which are deemed to be factual in nature are so found.

B. *Conclusions of Law*

1. The Court has diversity jurisdiction of the Counterclaim pursuant to 28 U.S.C. § 1332.

2. There are no material issues of fact remaining to be litigated with respect to the Counterclaim.

3. Horticultural is indebted to Allstate under the workers' compensation policy in the amount of $18,555.84, together with interest thereon at the legal rate from the date the Counterclaim was filed on February 6, 1979.

4. Horticultural is indebted to Allstate under the business liability policy in the amount of $5,386.55, together with interest thereon at the legal rate from the date the Counterclaim was filed on February 6, 1979.

5. Leatherwood has failed to maintain a distinction between his personal assets and the assets of Horticultural.

6. Leatherwood has commingled his personal funds with funds of Horticultural.

7. Leatherwood has diverted Horticultural's funds to his own uses.

8. Leatherwood has treated Horticultural's assets as though they were his own assets.

9. Leatherwood has controlled and dominated the business of Horticultural.

10. Leatherwood has conducted the business of Horticultural as though it were a sole proprietorship and has disregarded corporate formalities.

11. Since its incorporation, Horticultural has been undercapitalized. It has not had sufficient capital to pay its debts as they fell due.

12. There is such a unity of ownership and interest between Leatherwood and Horticultural that their separate identities and personalities do not exist.

13. It would be inequitable to allow Leatherwood to stand behind the corporate form to escape personal liability for the premiums owing to Allstate under the workers' compensation policy and under the business liability policy.

14. As a creditor of Horticultural, Allstate is entitled to bring this action against Leatherwood on Horticultural's behalf pursuant to California *Corporations Code* § 2009.

15. By his assumption of the contract for Horticultural to perform landscape construction at the location known as Oakridge Mall, Leatherwood took over an asset of Horticultural, without an order of Court, and without prior payment or adequate provision for payment of Horticultural's debts, including Horticultural's indebtedness to Allstate. The assumption of said contract by Leatherwood was made in contemplation of the termination by Horticultural of its corporate business.

16. Pursuant to California *Corporations Code* § 2009, Allstate is entitled to recover from Leatherwood on behalf of Horticultural the premiums owing to Allstate under the workers' compensation policy and the business liability policy.

17. Horticultural and Leatherwood jointly and severally are liable to Allstate in the amount of $23,942.39, together with interest thereon at the legal rate from the date the Counterclaim was filed on February 6, 1979, in the amount of $1,038.15.

18. All statements contained in the Findings of Fact set forth in section II(A) above which are deemed to be Conclusions of Law are so found.