**In the Matter of Gale Leroy LONG, Debtor.**

**Ron BOEHRINGER et al., Plaintiffs,**

v.

**Gale Leroy LONG, Defendant.**

Bkrtcy. No. 3–82–00478.
Adv. No. 3–82–0605.

United States Bankruptcy Court,
S.D. Ohio, W.D.

Dec. 27, 1983.

---

Ronald D. Keener, New Lebanon, Ohio, J. Joseph Walsh, Dayton, Ohio, for plaintiffs.

Thomas R. Noland, Dayton, Ohio, for debtor.

## DECISION AND ORDER

CHARLES A. ANDERSON, Bankruptcy Judge.

### FACTS

Presently before the court is plaintiffs' complaint objecting to the dischargeability of certain debts of an Ohio corporation, Farmersville Elevator, Inc. [FEI], owned by debtor, Gale L. Long. An involuntary petition was filed against FEI, a grain elevator, on July 16, 1981, and another involuntary petition was filed under Chapter 7 against Long on February 19, 1982, who consented to an adjudication on May 5, 1982. Subsequently, on September 13, 1982, the 26 plaintiffs filed their complaint to commence this action based on 11 U.S.C. § 523(a)(4), which was tried on August 22, 23, and 26, 1983. The parties stipulated that the plaintiffs have suffered losses in the amounts as set forth in the complaint, but they did not stipulate as to the cause or liability of those losses.

Long has been a farmer for about 25 years, working his own land and about 3,000 acres of other farm land. Since 1970, he has also operated, as a proprietorship, Gale Long & Sons Grain Co. [Longs' Grain], which was basically a grain elevator operation. The storage facilities were on his own farm and had a capacity of about 250,000 bushels.

In December, 1975, Long agreed to purchase all the outstanding stock of FEI, which he financed by withdrawing $229,000 from one of FEI's grain accounts. (He used none of his own money.) In January, 1976, he became (apparently upon divorce from his wife) the sole stockholder and sole director of FEI. During the five years he owned FEI, he continued to employ the same personnel except for one manager who resigned in 1979. On April 11, 1981, he sold FEI to Farmersville Feed and Grain Corporation, Inc.

From 1977 through 1980, FEI lost approximately $670,000 in its operations; while Longs' Grain lost $765,000. A balance sheet for the year ending Aug. 31, 1981, shows that FEI had a negative retained earnings of $585,170.

In spite of these staggering losses, Long authorized to pay himself $60,000 a year for the years 1978 and 1979. In addition to the withdrawal of cash to buy the corporation, Long withdrew amounts every year: another $76,000 in 1976, with other yearly total amounts ranging from $252,321 to $353,782 and $377,181. These "loans" carried no interest, no service charge and no carrying charge. Indeed, after an audit of Long's 1978 income tax returns, the Internal Revenue Service [IRS] concluded in 1980 that certain loans were not valid loans because there had been no repayment, little or no written evidence of them and no notation of them in the corporate records. As a result, the IRS treated these "loans" as dividends. For FEI's 1980 financial statements, Long's auditors treated these transactions in a similar fashion, with his approval.

These auditors, Alexander Grant & Company, in a May 12, 1981 letter to Long, indicated that Long had not billed FEI for 8,223.72 bushels of soybeans and for some trucking and hauling. Further, they noted that Long had paid the employee health insurance premiums for FEI from 1976 through April, 1981, while FEI paid almost $75,300 of Longs' Grain payroll.

Long and FEI engaged in many unrecorded transfers not only of money but also of grain: in Feb., 1980, he "sold" $60,453 worth of soybeans to FEI but only received $25,000 for them. Not infrequently, Long would sell personal grain to pay off FEI

debts. Long testified he even borrowed approximately $400,000 against his own farm to put into FEI.

FEI used a Kenworth "Semi" truck owned by Longs' Grain. Although used by FEI, the "Semi" was fueled at Longs' Grain. Grain tickets of the two elevators were used interchangeably. In 1978, there was a *de facto* merger of Longs' Grain's records and grain into FEI.

As grain elevators, both FEI and Longs' Grain would charge a fee for storing grain. The grain would be returned to the farmer, upon request, or it would be sold at a price specified by the farmer, with the sale proceeds remitted to the farmer less any storage/handling costs. This latter arrangement was termed "delayed pricing." When the grain was stored, the farmers received "grain tickets," duplicates of which were placed in the elevator's grain ledger to evidence its debt to the farmers for the grain. Instead of opening separate grain accounts, Long intermingled these grains and funds, maintaining that he believed he could always cover any discrepancies from his personal grain and assets.

Apparently, in an attempt to stay afloat, Long would sell for his own benefit quantities of the farmers' stored grain. These sales were made with neither the consent nor knowledge of the farmers, but all were made at Long's direction and with his approval. There is evidence tracing the resulting grain shortages back to 1978.

To hide the ever-growing disparity between the amount of grain actually stored in the elevators and his liability for grain as evidenced by the grain tickets from both his auditors and the inspectors from the Ohio Department of Agriculture, who regulate such elevator operations per ORC §§ 926.01 et seq., Long condoned and instructed FEI employees to remove tickets from the grain ledger, to put them in a "back room," and not to show them to anyone. These tickets were not returned to the ledger, except when a farmer requested his grain back, causing Long to juggle his books further by returning those requested tickets and removing another set.

Running totals were kept, however, of both records, "front" and "back" rooms. Long kept two sets of books to hide his losses, thereby thwarting the state's policy to police grain elevators.

When confronted with this, Long claimed, despite clear and convincing evidence to the contrary, that the records were incorrect, that he had never instructed such practices and that FEI's managers were to blame. He further testified, nevertheless, that he had believed he could always cover any losses from his own money and/or grain, again showing that he did not distinguish between the business entities in his own mind.

Plaintiffs contend that Long's dealings with FEI were such so as to make him personally liable for deposited grain not returned or paid for: they argue that the court should pierce FEI's corporate veil, find that Long defrauded the plaintiffs or unlawfully acquired their grain and so should be denied discharge for these debts per 11 U.S.C. § 523(a)(4), which reads:

§ 523. Exceptions to discharge.

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

\* \* \* \* \* \* \*

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

In response, Long claims that he is not liable for FEI's debts, since there was no established fiduciary relationship or express trust, since he did not benefit from the storage, and since he, in no way, intended to defraud plaintiffs. Throughout the trial, he insisted that he was not an employee of FEI and that he had no active control over FEI's operation or management. He maintained that he acted only as advisor and grain hauler.

In order to deny Long his discharge as to certain debts, plaintiffs must overcome two hurdles: 1) to prove that Long could be held personally liable for FEI's debts by piercing the corporate veil and 2) to prove that Long's conduct would fit into one of

the exceptions to discharge found in § 523, as pleaded.

I am satisfied that plaintiffs have proved both. Thus he should be denied a discharge as to certain debts to these plaintiffs, as further explained below.

## I. PIERCING THE CORPORATE VEIL

█ Deciding whether to pierce the corporate veil was simplified when Long himself admitted that this was done. On pages 10 and 11 of Defendant's Trial Brief, filed on October 6, 1983, he states, "... [Gale Long] raised the corporate veil himself to allow the corporation [FEI] to use his personal assets to cover corporate debt...." I am satisfied that Long's admission is a fair appraisal of the facts herein. I hereby adopt his admission and further find that FEI's corporate veil should be pierced.

While interpreting Ohio law on disregarding the corporate entity, the Sixth Circuit recently stated:

"No precise test for disregarding the corporate fiction has been articulated by the courts, each case being regarded as "sui generis" and decidable on its own facts. Nonetheless, certain general principles have been recognized. As recently set forth in *Brunswick Corp. v. Waxman*, 459 F.Supp. 1222, 1229 (E.D.N.Y.1978), aff'd 599 F.2d 34 (2d Cir.1979), the corporate fiction should be disregarded when: (1) domination and control over the corporation by those to be held liable is so complete that the corporation has no separate mind, will, or existence of its own; (2) that domination and control was used to commit fraud or wrong or other dishonest or unjust act, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong."

*Bucyrus-Erie Co. v. General Products*, 643 F.2d 413, 418 (6th Cir.1981). [Citations omitted.] The Court then considered other relevant factors: ignoring corporate formalities, undercapitalization and the existence of fraud. Other cases have listed yet other factors: comingling of corporate and personal funds, diverting corporate funds for personal use and merging the identities of the corporation and the director/owner.

*See, e.g., Horticultural Enterprises v. Allstate Ins. Co.,* 477 F.Supp. 161 (C.D.Cal. 1979) and *18 Am.Jur.2d, Corporations,* §§ 14–19. See, also, *11 O.Jur.3d, Business Relationships,* §§ 93–97, for discussion of Ohio case precedents.

Long consistently tended to merge the operation of FEI and Longs' Grain. As seen from the above outline of the facts, there are many examples of this, just a few of which are the merging of the books and grains, grain tickets being used interchangeably, FEI's use of Longs' Grain's semi, Long's transfers of grain and money, Long's payments of FEI employee health benefits, FEI's payment of the Longs' Grain payroll, and Long's erratic billing of his hauling services to FEI. Long's own testimony further reveals that he did not distinguish between the two entities in his mind. It is also apparent that there was a comingling of funds.

Long consistently ignored corporate formalities. FEI's corporate books reflected no resolutions about the health benefits, the payroll for Longs' Grain or the "loans"/withdrawals of cash, as noted by the IRS. The fact that FEI's balance sheet showed a negative retained earnings raised the spectre of serious undercapitalization.

Certainly, as discussed *infra,* the practice of hiding grain tickets from auditors and state inspectors is fraud.

All the above factors have caused courts to pierce the corporate veil. The *Bucyrus* test leads to the same conclusion.

Using the *Bucyrus* test, it is clear that Long's domination and control over FEI was so complete so as to render FEI without a separate mind, will or existence, even though he might not have concerned himself with the day-to-day course of business, as he testified. Few directors concern themselves with routine activities, leaving such matters for subordinates/employees. Rather, directors deal with general management and the business's objectives and practices, which Long did. His dominance/control is clear from the facts, which belie his assertions to the contrary.

Moving to the second prong of *Bucyrus,* Long's domination was used to sell the grain for his own benefit and to deceive the state inspectors by removing the tickets.

Thirdly, plaintiffs suffered an unjust loss when, after the tickets were hidden from the state inspectors, they continued to store grain at FEI and then lost that grain.

After review of these facts and of the entire testimony and pleadings, there is no doubt that FEI's corporate veil should be pierced.

Ohio law provides additional support for this finding to pierce the corporate veil.

ORC § 1701.93 makes a director personally liable who, with intent to deceive, removes an entry from the corporation's book. This statute reads in pertinent part, as follows:

§ 1701.93   False statement or entry.

(A) No officer, director, employee, or agent of a corporation shall, either alone or with another or others, with intent to deceive:

\*      \*      \*      \*      \*      \*

(2) Having charge of any books, minutes, records, or accounts of a corporation, make therein any entry which is false in any material respect, knowing such entry to be false, or remove, erase, alter, or cancel any entry therein, knowing that the entries resulting therefrom will be false.

(B) Whoever violates this section shall be personally liable, jointly and severally, with all other persons participating with him in any such act, to any person for any damage actually suffered and proximately resulting from such act.

By ordering the removal of the grain tickets to hide the shortage from the state inspectors, Long, with intent to deceive, removed an entry from FEI's books, making him personally liable for any damage proximately resulting.   Hence, Long by statute bears personal liability even if the corporate entity were not disregarded on case precedents.

ORC § 1701.95 imposes liability on directors who participate in the payment of improper dividends and in the making of loans to a director outside the usual course of business.   Some of these "loans" were later treated as dividends by the insolvent FEI.

Considerable evidence was submitted by plaintiffs to the effect that Long had improperly invaded substantial escrowed "grain accounts" maintained for the protection of elevator customers when he purchased the capital stock of FEI originally, in an amount in excess of $229,000.00; that the corporate record books did not evidence approval of the many loans, cash advances and grain transfers from the corporation to Defendant and for the benefit of Gale Long & Sons Grain Company over a period of approximately five years, all of which depleted reserves acquired for the protection of grain customers; and that the corporate and personal books and records do not document the details of and reasons for both corporate losses and personal losses in excess of $700,000.00.

## II

### § 523(a)(4) DENIAL OF DISCHARGE

Having thus held that Long's conduct at FEI caused him to be personally liable for FEI's debts to the plaintiffs, I now turn to the issue of whether he should be denied a discharge under this section.   To determine this, the question turns on whether his conduct fell within the conduct proscribed by this section:   whether there was fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny.

In dealing with these terms, I previously wrote:

The confused semantics traditionally employed in interpreting the applicable exceptions to a bankruptcy discharge are put in more practical focus by the statutory definition of "Theft" in Ohio (which includes conversion, embezzlement, larceny by trick, theft by deception, and similar prior statutory and common law offenses).   The intent required is commensurate with the offenses described in 11 U.S.C. §§ 523(a)(4) and 523(a)(6) for practical judicial application and implementa-

954

tion of the Congressional purpose. See Ohio Revised Code § 2913.02 which defines the offense, as follows:

§ 2913.02 Theft.

(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either:

(1) Without the consent of the owner or person authorized to give consent;

(2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;

(3) By deception;

(4) By threat.

This statutory definition of "Theft," which covers a plethora of former offenses of which the gist was larceny, embezzlement, conversion, fraud or false pretense (See § 2913.02 Legislative History: 134 v H 511. Eff. 1-1-74 and Committee Comment), leads to a focus on the facts and obviates the persistent preoccupation with the question of distinguishing various fiduciary capacities and the niceties of definitions of the crimes of "embezzlement, or larceny."

*Wilson v. Gentis,* 14 B.R. 369, 374 (Bkrtcy.S. D.Ohio 1981).[1]

▮ While many of the above facts were also relevant in determining to pierce the corporate veil, this part of the decision concerning dischargeability is based solely on Long's removal of the grain tickets, which removal hid FEI's true status from the auditors and state inspectors. As noted above, by removing the tickets, long violated ORC § 926.11(C), which requires that all records be subject to inspection by the state director of agriculture. Such violation is a crime per ORC § 926.99, and prevented the director from fulfilling his duties, as outlined in § 926.14, to seize the elevator, to audit it and to appoint a receiver. Had the

inspectors been aware of the hidden tickets, FEI would have been closed by the state, making it impossible for farmers to store additional grain there. Thus, this additional grain would not have been lost, when it was neither returned nor paid for. By selling the grain or not returning/paying for it, Long exerted control over it without the consent of the owner and beyond the scope of the express or implied consent of the owner. As such, Long's action fell within the scope of the Ohio theft statute and within the exception to discharge in § 523(a)(4).

Long argues that such an outcome would hinder his fresh start after bankruptcy and, as such, is contrary to the spirit of the Bankruptcy Code. Obviously it hinders his fresh start, but such is not contrary to the Code's spirit. Congress specifically excepted from discharge all debts caused by such conduct and by doing so expressed the clear intent of the Code.

Having found the debts are not dischargeable upon consideration of the foregoing findings of fact and conclusions of law, further analysis need not be now made as to the weight of the additional evidence mentioned, or as to the imputation of personal liability to the Defendant as sole stockholder, director, and officer since resolution of the issues presented was made on the basis of the concealment and alteration of the grain records.

Disregard of the corporate entity as a matter of law would be more pertinent to those other presented facts not now analyzed. Disregarding the corporate entity thus becomes somewhat an exercise in semantics because the cited Ohio statutory liabilities in effect accomplish the same result.

1. Since *Wilson,* the Ohio theft statute was slightly modified. The new statute, with changes from the former underlined, reads:

§ 2913.02 Theft.

(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either <u>the property or services in any of the following ways:</u>

(1) Without the consent of the owner or person authorized to give consent;

(2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;

(3) By deception;

(4) By threat.

These underlined changes do not alter the analysis in *Wilson,* which remains sound precedent.

Thus, FEI's/Long's debts to those plaintiffs who stored grain at FEI after the first concealment of grain tickets from state auditors should not be discharged and judgment should be rendered to the respective plaintiffs in the stipulated amounts as set forth in the complaint.