**In the Matter of TYPHOON INDUS-TRIES, INC., Bankrupt.**

**Bankruptcy No. 77 B 52.**

United States Bankruptcy Court,
E. D. New York.

Nov. 10, 1980.

888

Guggenheimer & Untermyer, New York City, by Ephraim K. Leibowitz, New York City, for Trustee.

Edward R. Korman, U. S. Atty., for the Eastern District of New York, by Karen Brown, Tax Div., U. S. Dept. of Justice, Washington, D. C., for claimant United States.

BORIS RADOYEVICH, Bankruptcy Judge.

The Court is called upon to resolve an objection to the claim of the District Director of the Internal Revenue Service advanced by the trustee of Typhoon Industries, Inc., an involuntary bankrupt. The government's claim, filed with this Court on October 20, 1977, demands payment of the sum of $55,354.48 as a priority claim for unpaid federal insurance contributions, withholding and unemployment taxes, together with pre–petition interest thereon. The claim includes taxes assessed against Typhoon Installation, Inc., Typhoon Fence of Jamaica, and Typhoon Industrial Fence, Inc., all of which are affiliates of the bankrupt corporation. The trustee's objection is based on his contentions that these affiliates are not subsidiaries of the bankrupt, and that in any event, the affiliates have been operated as independent corporate entities. For reasons which follow, the Court holds that the government's claim should be allowed in part as a fourth priority claim for non–dischargeable taxes, and allowed in part as a general unsecured claim.

FINDINGS OF FACT

1. An involuntary petition was filed against Typhoon Industries, Inc., on January 7, 1977. On March 2, 1977, an order was entered adjudicating the alleged debtor a bankrupt.

2. The District Director of the Internal Revenue ("the government") timely filed a claim against the bankrupt's estate on October 19, 1977. As amended on October 20, 1977, the government's claim seeks payment of the sum of $55,354.58 as a fourth priority claim for unpaid income tax withholding, federal insurance contributions ("FICA taxes"), and unemployment taxes ("FUTA taxes"), as well as pre–petition interest thereon.

3. Taxes assessed against the bankrupt for calendar year 1973 are included in the government's claim. Also included in the government's claim are taxes for various years, including 1973, which were assessed against Typhoon Installation, Inc., Typhoon Fence of Jamaica, Inc., and Typhoon Industrial Fence, Inc. The government's claim itemizes the specific taxes as follows (interest amounts are indicated in parentheses beneath the tax figures):

Typhoon Industries, Inc.

| Period | Withholding & FICA | FUTA |
|---|---|---|
| 1st Qtr. 1973 | $2,934.22 (751.83) | |
| 2nd Qtr. 1973 | $5,495.76 (1,187.87) | |
| 3rd Qtr. 1973 | $3,662.45 (641.32) | |
| 4th Qtr. 1973 | $3,830.40 (792.23) | |
| 1973 | | $ 825.59 (185.05) |
| 4th Qtr. 1976 | $5,366.81 | |
| 1976 | | $3,192.06 |
| TOTAL | $24,662.89 | $4,202.70 |

Typhoon Installation Inc.

| Period | Withholding & FICA | FUTA |
|---|---|---|
| 1st Qtr. 1973 | $2,392.98 (251.26) | |
| 4th Qtr. 1976 | $ 712.79 | |
| 1976 | | $ 814.44 |
| TOTAL | $3,884.94 | $ 814.44 |

Typhoon Fence of Jamaica, Inc.

| Period | Withholding & FICA | FUTA |
|---|---|---|
| 1st Qtr. 1973 | $ 372.97 (92.71) | |
| 2nd Qtr. 1973 | $ 372.97 (83.33) | |
| 3rd Qtr. 1973 | $ 372.97 (81.47) | |
| 4th Qtr. 1973 | $ 372.97 (72.87) | |
| 1973 | | $ 176.88 (35.98) |
| 4th Qtr. 1976 | $2,062.68 | |
| 1976 | | $ 420.14 |
| TOTAL | $3,884.94 | $ 633.00 |

Typhoon Industrial Fence, Inc.

| Period | Withholding & FICA | FUTA |
|---|---|---|
| 1st Qtr. 1973 | $ 298.48 (74.18) | |
| 2nd Qtr. 1973 | $ 298.42 (66.67) | |
| 3rd Qtr. 1973 | $ 298.42 (65.18) | |
| 4th Qtr. 1973 | $ 298.42 (60.76) | |

Typhoon Industrial Fence, Inc. (continued)

| Period | Withholding & FICA | FUTA |
|---|---|---|
| 1st Qtr. 1976 | $ 4,871.09 (236.78) | |
| 2nd Qtr. 1976 | $ 2,339.97 (72.35) | |
| 3rd Qtr. 1976 | $ 4,751.00 (63.76) | |
| 4th Qtr. 1976 | $ 3,200.11 | |
| 1976 | | $803.99 |
| TOTAL | $16,995.59 | $803.99 |

4. The trustee concedes, and the Court finds, that the government's claim is correct as to amount. Tr. at 43.

5. Benito Fernandez is the sole shareholder of Typhoon Industries, Inc., having acquired all of its shares in May of 1973. At the same time, he acquired all of the shares of Typhoon Installation, Inc., Typhoon Fence of Jamaica, Inc., and Typhoon Industrial Fence, Inc. (these three corporations are hereinafter referred to as "affiliates" of the bankrupt). Thereafter, B.R. Fernandez, Inc., a corporation wholly owned by Benito Fernandez, acquired all of the assets of Typhoon Industries, Inc., and changed its name to Typhoon Industries, Inc. Benito Fernandez had planned to have Typhoon Industries, Inc., purchase the shares of the affiliates from him, but this plan was never consummated. At all times relevant hereto, the relationship which existed between the bankrupt and its affiliates was that of brother and sister, rather than parent and subsidiary. Tr. at 40.

6. At all times relevant hereto, Benito Fernandez was the sole shareholder, sole director, Chairman of the Board and Chief Executive Officer of the bankrupt corporation and each of its affiliates. Tr. at 14, 17, 38.

7. Each of the affiliates had its own manager. Each manager served as an officer of his respective affiliate, as well as an officer of the bankrupt. Tr. at 18, 21. In all respects other than this, the bankrupt and its affiliates had common management.

8. Each of the affiliates shared office space with the bankrupt at Lindenhurst, Suffolk County, New York. They also shared the same telephone number. In addition, Typhoon Fence of Jamaica, Inc., maintained its own office and telephone number in Jamaica, Queens, New York. Tr. at 18.

9. All accounting for the affiliates was done on the books and records of the bankrupt corporation. Tr. at 21.

10. Each of the affiliates maintained separate checking accounts which were used as petty cash for small disbursements. All major expenses, including materials, supplies, taxes and the payroll, were paid by the bankrupt corporation from its own accounts. Tr. at 18–20.

11. Contracts which were executed by the affiliates had to be approved by the bankrupt corporation. Tr. at 20.

12. The letterhead of each affiliate bore a caption indicating that the affiliate was a division of the bankrupt corporation. Tr. at 17.

13. Customers of the affiliates frequently paid their bills with checks made payable to the bankrupt corporation. Checks which named the affiliates as payee were indorsed over to the bankrupt as a matter of course. Tr. at 31–32. All other monies received by the affiliates were deposited in the bankrupt's account. Tr. at 19, 22.

14. Benito Fernandez intended to operate the affiliates on a "break even" basis. Any cash surplus which remained with an affiliate was transferred to the bankrupt as a matter of course at the end of each accounting period. Tr. at 34–35.

15. The affiliates had virtually no assets. Vehicles and other equipment were owned by the bankrupt and used by the affiliates. Typhoon Fence of Jamaica, Inc., however, had its own office furniture for its office in Jamaica, Queens. Tr. at 29–30.

16. Each of the affiliates maintained its own employer identification number for federal payroll tax purposes. Whenever payroll taxes were withheld and paid, however, the bankrupt corporation withheld and paid these taxes for each of the affiliates. Tr. at 16, 20–21, 27–28.

17. The bankrupt maintained one workmen's compensation insurance policy and disability insurance policy for itself and all of the affiliates. Tr. at 21–22.

18. The bankrupt and its affiliates functioned as a single unit. Tr. at 28.

19. The New York State Secretary of State dissolved each of the affiliates for non-payment of franchise taxes. None of the affiliates has transacted any business since 1977. Tr. at 36, 38–39.

20. As a result of the dissolution of the affiliates as no asset corporations, the

government has no effective remedy against the affiliates for unpaid taxes.

## CONCLUSIONS OF LAW

■ 1. A corporation may be held liable for the obligations of commonly owned affiliate corporations, notwithstanding the absence of a parent–subsidiary relationship, if circumstances indicate that it would be inequitable for the corporation to escape liability for the affiliates' obligations.

2. The facts of this case indicate that the affiliates were mere instrumentalities or alter egos of the bankrupt, the bankrupt exerted complete control over the actions of the affiliates, that this control was used for purposes which were wrongful and contrary to public policy, and that the government has no effective remedy against the affiliates for unpaid taxes.

3. Since it would be inequitable to permit the bankrupt to escape liability for the tax obligations of its affiliates, the bankrupt's estate should be held liable for these taxes.

4. Withholding, FICA and FUTA taxes first become legally due and owing, for purposes of sections 17(a)(1) and 64(a)(4) of the Bankruptcy Act, on the last date fixed by federal tax law for filing a tax return. As a general rule, this date is the last day of the month following expiration of the relevant tax period.

5. The bankrupt and its affiliates were required to file withholding and FICA returns on a quarterly basis during each calendar year, and FUTA returns on an annual basis for each calendar year. The corresponding dates fixed for the filing of returns were January 31, April 30, July 31, and October 31 for withholding and FICA returns, and January 31 for FUTA returns.

6. The government's claim should be allowed only as a general unsecured claim to the extent that it is based upon FICA and withholding taxes, and interest thereon, assessed against the bankrupt or its affiliates for the first, second and third quarters of 1973. The balance of the government's claim should be allowed as a fourth priority claim for nondischargeable taxes.

## MEMORANDUM

In his post trial memorandum, the trustee argues that the bankrupt's estate should not be found liable for the tax obligations of affiliates which are not owned by the bankrupt; assuming the affiliates are subsidiaries, the government has not shown facts sufficient to warrant piercing the corporate veil; and, the government's claim should be disallowed to the extent that it is based upon taxes which first became due more than three years before the petition was filed against the bankrupt.

■ The Court disagrees with the trustee's first argument. A corporation is entitled to a presumption that it is an entity which is separate from its sister corporations parent corporations, subsidiaries and shareholders. *Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293 (1941); *American Renaissance Lines, Inc. v. Staxis Steamship Co.*, 502 F.2d 674 (2d Cir. 1974); *Worldwide Carriers, Ltd. v. Aris Steamship Co.*, 301 F.Supp. 64 (S.D.N.Y.1964); *Port Chester Elec. Constr. Corp. v. Altlas*, 40 N.Y.2d 652, 357 N.E.2d 983, 389 N.Y.S.2d 327 (1976). However, the corporate veil may be pierced if circumstances indicate that it would be unjust to permit the economic unit to escape liability. *Brunswick Corp. v. Waxman*, 599 F.2d 34 (2d Cir. 1979); *Worldwide Carriers, Ltd. v. Aris Steamship Co.*, 301 F.Supp. 64 (S.D.N.Y.1969). Moreover, a court of equity may pierce the "corporate wall," as well as the corporate veil, to hold an affiliate corporation liable for a sister corporation's debts. The same factors are relevant in either case. *Worldwide Carriers, Ltd. v. Aris Steamship Co.*, 301 F.Supp. 64 (S.D.N.Y. 1969). *See also In re Bowen Transports, Inc.*, 551 F.2d 171 (7th Cir. 1977); *Avco Delta Corp. v. United States*, 540 F.2d 258 (7th Cir. 1976), cert. denied, 429 U.S. 1040, 97 S.Ct. 739, 50 L.Ed.2d 752 (1977); *Soviero v. Franklin National Bank*, 328 F.2d 446 (2d Cir. 1964); *In re Himoff Maritime Enterprises, Ltd.*, 22 C.B.C. 36 (Bankr.Ct.S.D.N.Y. 1979).

■ New York courts have so frequently heard litigation involving the liability of a parent corporation for its subsidi-

ary's taxes that they have developed the so–called "instrumentality rule" as a guide in determining whether it is appropriate to disregard the corporate form. The test is met if three factors are present: control by the parent to such a degree that the subsidiary has become its mere instrumentality; fraud or wrong by the parent through its subsidiary; and unjust loss or injury to the claimant. *Lowendahl v. Baltimore & O.R. Co.*, 247 A.D. 144, 287 N.Y.S. 62, *aff'd*, 272 N.Y. 360, 6 N.E.2d 56 (1936). *See also Fisser v. International Bank*, 282 F.2d 231 (2d Cir. 1960); *Brunswick Corp. v. Waxman*, 459 F.Supp. 1222 (S.D.N.Y.1976), *aff'd*, 599 F.2d 34 (2d Cir. 1979). Various other rules have been developed, including the so–called "alter ego" theory. According to this theory, the corporate veil may be pierced if certain factors are found to be present, such as the following: the subsidiary does not trade under its own name; the subsidiary does not have separate assets, creditors or obligations; the subsidiary has not held itself out to the general public and trade creditors as a business separate and distinct from the parent; there has been a commingling of assets between subsidiary and parent; the subsidiary has grossly inadequate capital; the parent pays the debts of the subsidiary; the subsidiary's source of business is dependent in some way upon that of its parent; and, in the conduct of its affairs, the subsidiary disregarded its separate and independent corporate entity. *In re Eagle Clothes*, 5 B.C.D. 269 (S.D.N.Y. 1979), *citing In re Beck Indus., Inc.*, 479 F.2d 410 (2d Cir. 1973), *cert. denied sub nom. Trustees of Beck Indus., Inc. v. Feldman*, 414 U.S. 858, 94 S.Ct. 163, 38 L.Ed.2d 108 (1973). *See also In re Unishops, Inc.*, 494 F.2d 689 (2d Cir. 1974). Actionable fraud is not an essential element of either theory. *See Brunswick Corp. v. Waxman*, 599 F.2d 34 (2d Cir. 1979). Indeed, it may be doubted that there is any difference in these theories. The second circuit has echoed the remarks of a leading commentator in this regard: " 'No concept of separate corporate personality will suffice to solve an actual problem' ... 'What the formula comes down to, once shorn of verbiage about control, instrumentality, agency and

corporate entity, is that liability is imposed to reach an equitable result.' " *Id.* at 36 (citations omitted).

█ The facts and circumstances of this case indicate that it would be inequitable to permit the bankrupt corporation to escape the tax obligations of its affiliates. This conclusion is inescapable under either of the aforementioned theories. To begin with, all of the usual indicia of control are present. Benito Fernandez was the sole shareholder and director, and was president of the bankrupt and each of the Typhoon affiliates. The bankrupt and its affiliates had common management as well, differing only to the extent that each affiliate had a different general manager. The general managers, however, were officers of the bankrupt. The affiliates had no assets of their own. The affiliates had no books and records of their own; all bookkeeping functions were performed for them by the bankrupt's bookkeeper, and all entries were made on the bankrupt corporation's books and records. If these records showed that the affiliate had a cash surplus, it was simply transferred as a matter of course to the bankrupt's accounts. The payroll, payroll taxes, materials and equipment costs all were carried by the bankrupt on its books and paid by the bankrupt. Although Typhoon Fence of Jamaica had its own office and telephone number in Jamaica, Queens, it also shared an office with the bankrupt and the other affiliates in Suffolk County, New York. The affiliates were required to obtain the bankrupt's approval prior to accepting a job, and all revenues from these jobs were transferred to the bankrupt. The letterhead of each affiliate bore a caption indicating that it was a division of the bankrupt corporation. The affiliates so carelessly maintained their separate corporate identities that customers' checks were often made payable to the bankrupt rather than the affiliate which had performed the job. These facts unquestionably indicate that the bankrupt was the dominant corporation, while the affiliates were mere instrumentalities or alter egos of the bankrupt.

Moreover, it is clear that the bankrupt corporation exercised this control over its

affiliates in a way which is violative of public policy, and caused them to breach their obligations under the law. The affiliates, were operated as no–asset corporations. If an affiliate developed a cash surplus, it was denuded of it by the bankrupt as a matter of course. Although the bankrupt had assumed the responsibility for paying some of the affiliates' taxes, the bankrupt's course of conduct left the affiliates without sufficient funds to satisfy any remaining tax obligations. Neither Fernandez nor the bankrupt took any action to prevent the 1976 dissolution of the affiliates by the New York Secretary of State for non–payment of franchise taxes. This Court takes notice of provisions of New York State law which authorize dissolution for non–payment of franchise taxes only after two years' delinquency; this indicates that franchise taxes went unpaid during the period of ownership by Fernandez and control by the bankrupt. The Secretary of State's action deprived the government of any effective remedy against the affiliates, thus causing injury to the government. The Court also takes cognizance of the trustee's concession that the Internal Revenue Service's assessments against the affiliates were correct as to the amount, *see United States v. Prince*, 348 F.2d 746, 748 (2d Cir. 1965), and finds that the bankrupt used its domination and control over the affiliates for purposes which were wrongful, unlawful and violative of public policy. The Court concludes that the government has met its burden of proof on these issues.

■ Given that these taxes were legally due and owing by the bankrupt to the government, the trustee argues that a part of the taxes claimed by the government are not entitled to priority treatment because they did not first become due and owing within three years of bankruptcy. Section 64(a)(4) of the Act, 11 U.S.C. § 104(a)(4), with certain exceptions that are not relevant in this case, extends a fourth priority to taxes which are not dischargeable. Under section 17(a)(1) of the Act, 11 U.S.C. § 35(a)(1), a tax is not dischargable if it first becomes legally due and owing by the bankrupt to the taxing authority "within

three years of bankruptcy." The word "bankruptcy," when used in the Act as a measure of time, means the date upon which the petition was filed. 11 U.S.C. § 1(13). This definition applies even in involuntary cases. *See Pan American Van Lines v. United States*, 607 F.2d 1299 (9th Cir. 1979); *In re John Horne Co.*, 220 F.2d 33, 34 (7th Cir. 1955). In the present case, the government's claim is entitled to a fourth priority to the extent that it is based upon taxes which first became legally due and owing within the period of January 7, 1974 to January 7, 1977, the latter being the date of the petition herein.

The government argues that withholding and FICA taxes first become due, for purposes of sections 17(a)(1) and 64(a)(4) of the Bankruptcy Act, when the period of limitations for Internal Revenue Service assessment and collection procedures begins to run. This period is measured from April 15 of the calendar year next succeeding the year in which the tax period ended. I.R.C. § 6501(b)(2). Thus, the government contends that withholding and FICA taxes attributable to any period during calendar year 1973 or later first became due on April 15, 1974. Since this date is within three years of bankruptcy in the present case, the government asks this Court to allow its claim in full as a fourth priority claim against the bankrupt's estate.

This Court disagrees with the government's position. The leading case in this circuit is in *In re Kopf*, 299 F.Supp. 182 (E.D.N.Y.1969). *Kopf* involved a debtor who had filed a petition for reorganization on April 1, 1965, and was later adjudicated a bankrupt. The bankrupt filed an objection to the government's priority claim for certain unpaid taxes, including personal income taxes for calendar year 1961. The bankruptcy judge allowed the government's claim for 1961 taxes as a general unsecured claim only. The district court reversed this determination on appeal, holding that the 1961 personal income tax did not become legally due and owing for purposes of section 64(a)(4) of the Act until April 15, 1962, the date upon which the taxpayer was required to file a return, and that the government's claim should have been allowed as a

priority claim. The district court noted that its conclusion was in accord with other cases relying on the tax return date to determine when a federal income tax liability matures. *E. g., United States v. Northwestern Mutual Ins. Co.*, 315 F.2d 723 (9th Cir. 1963); *Hartman v. Lauchli*, 238 F.2d 881 (8th Cir.), *cert. denied*, 353 U.S. 965, 77 S.Ct. 1048, 1 L.Ed.2d 915 (1957). *Cf. Otte v. United States*, 419 U.S. 43, 95 S.Ct. 247, 42 L.Ed.2d 212 (1974) (employer FICA and income tax withholding contributions, based upon wages earned prior to bankruptcy but paid as second priority wage claims after bankruptcy, become due when wages are paid, and government's claim is entitled to second priority); *Pomper v. United States*, 196 F.2d 211 (2d Cir. 1952) (withholding taxes on wages paid prior to employer's bankruptcy become due when wages are paid, and government's claim is entitled to first priority). *Kopf* does not hold, as the government suggests, that every federal tax first becomes due and owing when the statute of limitations for assessments begins to run. The issue on appeal in *Kopf* was limited to a determination of when the 1961 personal income tax liability of the bankrupt first became due, given the fact that the bankrupt had timely filed a return. It is true that the district judge found additional support for his conclusion in the fact that the statute of limitations on income tax assessments begins to run on the date an income tax return is filed, 299 F.Supp. at 185, but this was not crucial to his decision. Indeed, it is only when an income tax return is filed on or before the last day fixed for filing returns that the due date happens to coincide with the date upon which the statute of limitations begins to run; in such cases, the period of limitations is measured from the due date. I.R.C. § 6501(b)(1). If no return is filed by the due date, however, the statute of limitations does not begin to run until a return actually is filed. I.R.C. § 6501(a). Thus, in a case in which the Internal Revenue Service had extended from March 15 to September 15 the date upon which the corporate taxpayer's income tax return was due, the ninth circuit, citing *Kopf*, held that the crucial date for purposes of Bankruptcy Act sections 17(a)(1) and 64(a)(4) was the original due date for the return. *Pan American Van Lines, Inc. v. United States*, 607 F.2d 1299, 1303 (9th Cir. 1979). The court expressly rejected the government's argument that the three year period employed in section 17(a)(1) of the Act was meant to coincide with the three year period of limitations for assessment of the income tax. *Id.* Adoption of the government's argument in cases in which no return or late returns have been filed would be to ignore the plain meaning of the phrase "first becomes legally due and owing," *id.*, as well as federal policy on the question of priorities. To be sure, tax law should be consulted to determine when a tax first becomes due for these purposes. *See* 3A Collier on Bankruptcy ¶ 64.405[1] (14th ed. 1975). It is quite another matter to suggest that tax law alone should dictate the result in this case. The Bankruptcy Act is an overriding statement of federal policy on the question of priorities in the distribution of estates. *United States v. Randall*, 401 U.S. 513, 515, 91 S.Ct. 991, 993, 28 L.Ed.2d 273 (1971).

■ There is no reason to adopt a different rule for withholding, FICA or FUTA taxes. With respect to each of these taxes, the date fixed for filing returns is the last day of the first calendar month [1] following the period for which the return is made. 26 C.F.R. § 31.6071(a)–1(a), (c). *See* I.R.C. § 6071. Withholding and FICA returns are required for each calendar quarter unless the District Director orders the employer to file monthly returns.[2] 26 C.F.R. §§ 31.-

---

1. FICA and FUTA returns also may be filed on or before the 10th day of the second calendar month following expiration of the taxable period if the employer has made timely deposits under I.R.C. § 6302 and applicable regulations, and the tax has been paid in full. 26 C.F.R. § 31.6071(a)–1(a), (c). These regulations do not apply in the present case, since the trustee has conceded that the government's claim is correct as to the amounts claimed for any given period.

2. Again, on the basis of the government's claim and the trustee's concession, it will be presumed that the District Director did not insist upon monthly withholding and FICA returns. *See* note 1 *supra*.

6011(a)–1(a), 31.6011(a)–4(a). FUTA returns are required for each calendar year. 26 C.F.R. § 31.6011(a)–3. Therefore, as a general rule, withholding and FICA returns are due on the last days of January, April, July and October of each year, and FUTA returns are due on the last day of January of each year. For reasons previously discussed, the Court finds that these are the dates upon which withholding, FICA and FUTA taxes first become due for purposes of sections 17(a)(1) and 64(a)(4) of the Bankruptcy Act. Accordingly, the Court holds that the government's claim is dischargeable to the extent that it is based on withholding and FICA taxes for the first, second or third quarters of 1973. It is also dischargeable to the extent that it is based on interest on these dischargeable taxes. *Pan American Van Lines, Inc. v. United States*, 607 F.2d 1299, 1303–04 (9th Cir. 1979). The balance of the government's claim should be allowed as a fourth priority claim for non–dischargeable taxes.

It is SO ORDERED.