**In re F & S CENTRAL MANUFACTURING CORP., Debtor.**

**Marianne DE ROSA, Trustee of the Estate of F & S Central Manufacturing Corp., Plaintiff,**

v.

**N.P.S.I., INC. and N.P.S. Corp., Defendants.**

**Bankruptcy No. 882–82533–18.
Adv. No. 884–0323–18.**

United States Bankruptcy Court,
E.D. New York.

March 3, 1987.

See also, Bkrtcy., 53 B.R. 842.

Shaw, Goldman, Licitra, Levine & Weinberg, P.C., Garden City, N.Y., for trustee.

Winick & Rich, P.C., New York City, for defendants.

Robert L. Stober, Secaucus, N.J., Asst. Gen. Counsel to debtor.

Louis P. Rosenberg, Brooklyn, N.Y., for trustee on Sale of Assets.

### DECISION & ORDER

C. ALBERT PARENTE, Bankruptcy Judge.

The trustee of the bankruptcy estate of F & S Central Manufacturing Corp. ("F & S") brought this adversary proceeding against the defendants N.P.S.I., Inc. (hereinafter "N.P.S.I." or the "subsidiary") and N.P.S. Corp. (hereinafter "N.P.S." or the "parent") seeking damages in the sum of $550,000.00 alleged to have been incurred as a result of the defendants' failure to consummate a contract for the purchase of the debtor's assets.

### FINDINGS OF FACT

On October 6, 1982 the debtor filed a voluntary Chapter 11 petition in bankruptcy under Title 11 of the U.S.C. At the time the petition was filed, debtor was engaged in the business of machine and tool die cutting. It had facilities in Brooklyn, New York and Atlanta, Georgia.

The trustee was appointed on March 11, 1983 and continues in that capacity pursuant to 11 U.S.C. § 323 (1986).

Marine Midland Bank ("M.M.B."), a secured creditor, sought to assist the trustee in finding a purchaser for the assets of F & S, thus enabling the debtor to satisfy the claim of M.M.B. and other creditors. As a result of the efforts of M.M.B., Louis Rosenberg, Esq., counsel to the trustee, was contacted by Gerald Feller, a partner in the law firm of Kaye, Scholer, Fierman, Hayes & Handler ("Kaye, Scholer"), the attorneys for M.M.B., concerning a possible purchaser of the F & S assets. Mr. Rosenberg notified the trustee on or about March 15, 1983 that a meeting on the matter would take place at the offices of Kaye, Scholer. The trustee advised Mr. Rosenberg to attend the conference and report to her on its outcome.

Among those in attendance at the April 5, 1983 meeting were Mr. Rosenberg, Mr. Feller, Melvin Slade, Esq. of Slade & Pellman, attorneys for N.P.S., Colin Halpern, chairman of the board of directors of N.P.S., Jack L. Cohen, an employee of N.P.S., John F. Barton, president of N.P.S. Industries, Inc., a subsidiary of N.P.S. Technologies which in turn is a subsidiary of N.P.S. Corp., Edward Kirtman, loan officer of M.M.B., and William Weiss, Esq., attorney for the debtor.

The parties agree that a purchase price of $1,650,000.00 for the F & S assets was set with $1,200,000.00 of that sum to be turned over to M.M.B. at closing in full satisfaction of its secured interest.

The parties disagree, however, on the identity of the offeror. N.P.S. contends that the offeror was N.P.S.I., an independent corporate subsidiary. Mr. Rosenberg testified that N.P.S. was the offeror, although he believed N.P.S. intended to set up a new corporation for the purpose of operating the business subsequent to the purchase of F & S' assets.

By letter of April 29, 1983 Slade & Pellman forwarded a formal written offer to William Weiss, Esq., counsel to F & S, outlining the specific terms and conditions of sale of the F & S assets by the trustee. This offer was rendered by N.P.S.I. and in pertinent part fixed the purchase price of

the assets at $1,650,000.00. The sale was predicated upon the satisfaction of conditions precedent which included *inter alia* (1) purchaser's obtaining financing from M.M.B.; (2) execution of a non-compete agreement by the principal of the debtor, A.A. Shamah; (3) assignment to N.P.S.I. of the real property and equipment leases held by F & S; (4) delivery of a certified copy of the bankruptcy court order approving the sale of F & S' assets to N.P.S.I.

The trustee made an application to the court requesting approval of the sale in accordance with the terms of the letter of April 29. The application was heard on May 31, 1983 with officers and attorneys of N.P.S. present. The court by order dated July 7, 1983 approved the sale of the assets of F & S to N.P.S.I. and set the date for closing for July 8, 1983.

The trustee and Mr. Rosenberg appeared at the offices of Slade & Pellman on July 8, 1983 prepared to close the sale. They were informed by the attorneys for N.P.S.I. that the closing would not proceed. N.P.S.I. was not yet satisfied with the terms of the non-compete agreement, a condition precedent in the contract. In addition, they alleged that F & S equipment had suffered damage subsequent to the court's approval of the sale, rendering it less valuable than originally stated.

Thus, on July 14, 1983 a hearing was conducted in bankruptcy court for the purpose of resolving these outstanding issues. At the hearing, Messrs. Slade and Barton appeared for both N.P.S. and N.P.S.I. Mr. Barton testified that he was president of N.P.S. Industries. It was later learned that Mr. Barton was also president of N.P.S.I. This was just one of many misleading statements made to the court as part of the ambiguous and evasive testimony consistently given by officers and employees of N.P.S. and N.P.S.I. At the conclusion of the hearing the outstanding issues remained unresolved. However, the parties agreed to meet privately and continue to negotiate.

The parties, failing to reach agreement, requested yet another hearing. At the .

hearing on July 28, 1983 the terms of the non-compete agreement were resolved. The parties failed, however, to settle on a value for the damaged F & S equipment. The trustee and Mona Lipp, Esq., of Slade & Pellman, agreed that at a hearing following the closing of the sale the issue would be heard and the court's disposition of the matter would be binding on all parties.

Ms. Lipp, the attorney for N.P.S.I., suggested that the court set August 1, 1983 as a closing date, a request which was granted by the court.

On August 1, 1983, once again the trustee, Mr. Rosenberg and other interested parties presented themselves at the offices of Slade & Pellman prepared to consummate the sale. The non-compete agreement of Mr. Shamah, as well as other pertinent documents, had been delivered to the offices previously and were held in escrow awaiting final signatures. It was, therefore, astonishing when Eugene Wexler, Esq. of Slade & Pellman announced without further explanation that there would be no closing.

The trustee sought relief from the court specifically requesting an order to compel N.P.S.I. to close the sale. At the hearing on August 4, 1983, John F. Triggs, Esq. of Slade & Pellman, testified:

All I know in terms of why the offeror withdrew, it does not want and cannot close the transaction, and there are probably no circumstances under which it will effectuate this deal.

\* \* \* \* \* \*

They are well aware of the consequences of these decisions. We cannot close, we won't close, and the trustee has to do what she thinks is necessary to pursue their cause of action if she wishes to do that.

Tr. of hearing of August 4, 1983, p. 11.

On September 13, 1983 the trustee was authorized by court order to commence any necessary proceedings against N.P.S.I. and N.P.S. to recover deficiencies and damages incurred by the estate as a result of defendants' breach.

The trustee's efforts to find a buyer for the assets of F & S ended successfully with the court approved sale of the assets to Carpenter & Patterson for $1,100,000.00, $550,000.00 less than the approved selling price to N.P.S.I.

The history of N.P.S.I. is set forth chronologically based upon the evidence and testimony at trial. Throughout the course of the case, the officers and employees of N.P.S.I. and N.P.S. were uncooperative, answering questions in an ambiguous and evasive manner in an apparent attempt to avoid full disclosure of the truth about the functioning of both parent and subsidiary corporations. Nevertheless, the following history was compiled.

On April 22, 1983 N.P.S.I., Inc. was incorporated under the laws of the State of New York listing Leona Leo, Esq., a staff attorney of N.P.S. Corp., as the incorporator. More than two months later on June 27, 1983, without a shareholders' meeting, the by-laws were adopted and directors of the corporation were elected. The board of directors consisted of Colin Halpern, Gail Halpern and Albert J. Mollenbeck.

Sometime after June 27, 1983, the directors, by resolution, elected the following officers: John F. Barton, president, Madho P. Jain, executive vice-president and treasurer, Robert C. Paladino, vice-president and assistant secretary, Albert L. Stoler, secretary. The resolution is undated rendering it impossible to discern the exact date on which the election occurred.

N.P.S. offered and N.P.S.I. accepted the offer to purchase one thousand shares of common stock of N.P.S.I., the total number of authorized shares of the corporation, at par value $.10 for a total of $100.00. Again, the date was omitted from the document in evidence. It is clear that N.P.S. never issued a check to N.P.S.I. for the stock, nor were any N.P.S.I. shares ever issued to N.P.S. or to any other party. The stock transfer ledger remains devoid of any entries. Furthermore, N.P.S.I. remained functionally inoperative. It never opened a

bank account, never paid wages, and never rented a plant or office.

Barton revealed to the court for the first time on September 29, 1986, that he was president of N.P.S.I., a position he had held since June, 1983. He testified that although he was president of N.P.S.I. he never entered into any contracts on its behalf, nor was he involved in the negotiations with M.M.B. to secure financing for the purchase of the F & S assets. Tr. of September 29, 1986 at 136–39. These negotiations were conducted by Colin Halpern, CEO of N.P.S. Barton testified that he did not learn that N.P.S.I. would not consummate the purchase of F & S assets until the evening of Friday, July 29, 1983, when Halpern entered his office and informed him that the bank would not supply the necessary financing. Tr. of September 29, 1986 at 145. When asked if he called Marine Midland to confirm this news, his response was "Of course not.... Why should I doubt Mr. Halpern's word." Tr. of September 29, 1986 at 145.

The evidence established that the Marine Midland Bank had not withdrawn its financing, as was suggested by Halpern both to Barton on July 29, 1983 and reiterated to the court in the course of Halpern's testimony of October 15, 1986. Halpern's position was directly contradicted by the testimony of Edward Kirtman, an account executive of M.M.B. He testified in response to the question, "Did Marine Midland Bank ever refuse to finance the purchase of the assets of F & S Central by N.P.S.?" by stating: "No, it always continued to proceed to finance under terms as originally stated." Tr. of October 15, 1986 at 150.

This testimony is supportive of the in-court statement of Larry Glich, counsel for M.M.B. At the hearing of August 4, 1983, the court (Parente, J.) queried, "And the funds required for the consummation were available, is that correct?" and Mr. Glich responded, "That's correct, Your Honor." Tr. of August 4, 1983 at 22.

On April 19, 1983 the Marine Midland Bank approved a loan of $2,150,000.00 consisting of a $1,650,000.00 term loan and $500,000.00 in working capital conditioned on the infusion of an additional $300,000.00 of capital presumably to be supplied by N.P.S.

On June 6, 1983 the bank approved an increased loan of $3,150,000.00 consisting of the $1,650,000.00 term loan and $1,500,-000.00 in working capital. The loan provided for a limited guaranty by N.P.S.

Despite the evasive testimony of Colin Halpern, it was established that N.P.S. Corp. guaranteed $1,000,000.00 of the loan, a guarantee which was never revoked by N.P.S.' directors. Tr. of October 15, 1986 at 89.

On July 29, 1983 Halpern initiated a meeting with Robert Webb at M.M.B. Only officers of N.P.S. and M.M.B. were present when Halpern informed M.M.B. that the financial condition of some of N.P.S.'s subsidiaries had declined, although the parent remained financially healthy.

Halpern testified that it was agreed by the parties present at the July 29 meeting that M.M.B. would not go forward with the financing, a conclusion contradicted by the testimony of Messrs. Kirtman and Glich.

Barton, president of N.P.S.I., knew nothing of the meeting's occurrence until Halpern told him of its outcome later that evening when Halpern informed Barton that N.P.S.I. would not close on the purchase of F & S' assets. Characteristically, Barton accepted these instructions without question. Once again he permitted Halpern to act as puppeteer, manipulating the corporate strings of N.P.S.I. Barton silently acquiesced. The trustee did not even receive a phone call informing her in advance of N.P.S.I.'s decision, but learned of it on Monday, August 1, 1983 when she and her attorney appeared at the offices of Slade & Pellman prepared to close the sale.

## DISCUSSION

The trustee alleges that she entered into a valid contract for the sale of the assets of F & S with N.P.S.I. which was breached by the defendants, resulting in damage to the estate. She seeks recovery for the damages suffered not only from N.P.S.I., but

from its parent N.P.S. on the theory that N.P.S.I. was either the instrumentality or alter ego of the parent company, thereby rendering N.P.S. liable for the damages incurred.

The defendants contend that an enforceable contract never existed. They raise the statute of frauds as a defense and argue that even if a valid contract is proven, it was between the trustee and N.P.S.I., an independent corporation, and not between the trustee and N.P.S. Corp., the parent corporation. They rely on *Brunswick Corp. v. Waxman,* 599 F.2d 34 (2d Cir. 1979), a decision of the Second Circuit Court of Appeals, to refute the trustee's attempt to pierce the corporate veil.

It is undisputed that as a no-asset corporation N.P.S.I. is judgment proof. Consequently, a judgment against N.P.S.I. cannot lead to recovery by the estate unless the resources of N.P.S. can be tapped. Therefore, as a practical matter, the threshold inquiry must relate to piercing the corporate veil.

*Piercing the Corporate Veil*

█ The corporate veil may be characterized as a thin gossamer membrane of state law which envelopes an entity, protecting its owners from unlimited liability. When, as in the case at bar, that veil is so thin as to be transparent, the law insists that the true owners be held liable for acts performed in the corporate name. The receipt of a certificate of incorporation is not a license to avoid liability without impunity. As will be shown infra, N.P.S.I. was a mere instrumentality or alter ego of its parent N.P.S. without substance or life of its own.

It is well settled law that "[a] parent or affiliated corporation will not be held liable for the contractual obligations of a subsidiary or affiliate unless it is exercising complete domination and control in that matter." *Gulf & Western Corp. v. New York Times Co.,* 81 A.D.2d 772, 439 N.Y.S.2d 13 (App.Div. 1st Dept.1981); *Musman v. Modern Deb, Inc.,* 50 A.D.2d 761, 377 N.Y.S.2d 17 (App.Div. 1st Dept.1975) (per curiam); *In re Alsted Automotive Warehouse, Inc.,* 16 B.R. 926 (Bankr.E.D.N.Y.1982).

Courts have long struggled with determining the boundary lines between dependence and independence, requiring that before the corporate veil may be pierced it must be proven that the subsidiary is nothing more than a mere instrumentality or department of the parent. *In re Alsted Automotive Warehouse, Inc.,* 16 B.R. at 931 (Bankr.E.D.N.Y.1982); *Public Adm'r. v. Royal Bank of Canada,* 19 N.Y.2d 127, 278 N.Y.S.2d 378, 224 N.E.2d 877 (1967); *Lowendahl v. Baltimore & Ohio R.R. Co.,* 247 A.D. 144, 287 N.Y.S. 62, *aff'd.,* 272 N.Y. 360, 6 N.E.2d 56 (1936).

The instrumentality rule requires: (1) The parent must exercise domination and control over the subordinate corporation; (2) The parent must use this control to commit fraud or a wrongful or unjust act; (3) The plaintiff must suffer injury or unjust loss as a result of the parent's act. *Brunswick Corp. v. Waxman,* 459 F.Supp. 1222 (E.D.N.Y.1978), *aff'd.,* 599 F.2d 34 (2d Cir.1979); *In re Typhoon Indus., Inc.,* 6 B.R. 886, 891 (Bankr.E.D.N.Y.1980); *Fisser v. International Bank,* 282 F.2d 231 (2d Cir.1960).

Proof of the first prong of this tripartite formula is a factual determination. Courts have held that singular factors such as the existence of a single shareholder "parent" corporation, interlocking directorates and officers, or stock control, are insufficient to prove domination, although several factors in tandem may establish a parent's control of its subsidiary. *In re Pearl-Wick Corp.,* 15 B.R. 143 (Bankr.S.D.N.Y.1981), *aff'd.,* 26 B.R. 604 (S.D.N.Y.1982); *Musman v. Modern Deb, Inc.,* 50 A.D.2d 761, 377 N.Y.S.2d 17 (App.Div. 1st Dept.1975) (per curiam).

The court in *In re Eagle Clothes, Inc.,* 5 B.C.D. 269 (Bankr.S.D.N.Y.1979), posed a series of inquiries which are probative on this issue. They include:

(a) Does the subsidiary trade under its own name; (b) does the subsidiary have separate assets, creditors and obligations; (c) has the subsidiary consistently held itself out to the general public and trade creditors as a business sepa-

rate and distinct from the debtor/parent; (d) has there been a commingling of assets between subsidiary and parent; (e) does the subsidiary have grossly inadequate captial; (f) does debtor/parent pay the debts of the subsidiary; (g) is subsidiary's source of business dependent in any way upon that of its parent; (h) is there any indication that in the conduct of its affairs the subsidiary disregarded its separate and independent corporate entity.

*In re Eagle Clothes, Inc.*, 5 B.C.D. at 270 (Bankr.S.D.N.Y.1979), *accord, In re Beck Indus., Inc.*, 479 F.2d 410 (2d Cir.), *cert. denied sub nom., Trustees of Beck Indus., Inc. v. Feldman*, 414 U.S. 858, 94 S.Ct. 163, 38 L.Ed.2d 108 (1973).

In the case at bar, the pattern is clear. N.P.S. completely dominated N.P.S.I. N.P.S.I. was never anything more than a "straw" corporation in possession of a corporate certificate. It never conducted business under its own name. It never had any assets or obligations of its own. Its officers were titular heads unable to make and implement decisions on their own without direct orders from N.P.S. Corp. in general and Colin Halpern in particular. Barton, as president of N.P.S.I. received all instructions from Halpern and was permitted no latitude of discretion in conducting the affairs of N.P.S.I. His salary was received from his true employer, N.P.S. He accepted on faith Halpern's instructions including the demand to forgo closing on the purchase of the F & S assets despite the fact that this acquisition was the only reason for N.P.S.I.'s existence. N.P.S.I. was never capitalized, nor apparently did its directors ever intend for it to be capitalized. N.P.S.I. did not even have a bank account. It never received the $100.00 it was due from N.P.S. for the sale of its stock. Payment of legal fees and other expenses came directly from the coffers of N.P.S. without even a journal entry on the books of both corporations to evidence the occurrence of a transaction between two allegedly independent companies.

During its brief period of existence, N.P.S.I. resembled a fetus during gestation clinging tenuously, desperately for life by its financial umbilical cord, unable to survive on its own outside the protection of N.P.S. That relationship was aborted by the intentional unjust acts of the parent. Colin Halpern, without input or consultation of N.P.S.I., informed M.M.B. that N.P.S. would no longer guarantee the loan. Then, despite the apparent willingness of M.M.B. to continue funding the purchase of the F & S assets, Halpern wrongfully instructed Barton to renege on the purchase. Barton accepted this decision placidly without question or protest, indicating once again that N.P.S.I. was nothing more than the alter ego of N.P.S. As with the case of an underdeveloped fetus, severing the umbilical cord caused the immediate death of the subsidiary, clearly indicating that it never had a viable life of its own.

The defendants rely on *Brunswick Corp. v. Waxman*, 599 F.2d 34 (2d Cir.1979), *aff'g* 459 F.Supp. 1222 (E.D.N.Y.1978), to stave off the piercing of the corporate veil. The court in *Brunswick*, quoting Latty, Subsidiaries and Affiliated Corporations 191 (1936), cogently stated: "What the formula comes down to, once shorn of verbiage about control, instrumentality, agency and corporate entity, is that liability is imposed to reach an equitable result." *Brunswick Corp. v. Waxman*, 599 F.2d at 36 (2d Cir. 1979). In *Brunswick*, the court did not pierce the corporate veil because the party dealing with the dummy corporation had actual or imputed knowledge that it had been created for the specific purpose of limiting the liability of the principals. *Id.* Thus, the court concluded the plaintiff "obtained precisely what it bargained for ..." *Id.* In the case at bar, the trustee believed as a result of the defendants' actions that it was doing business with a newly incorporated entity whose purpose was to actively conduct a tool and dye cutting business. N.P.S.I. misled the trustee and the court, testifying that it had several employees actively on its payroll, making closing of the sale imperative lest it continue to pay wages without production. The truth was

that N.P.S.I. had no employees, no payroll, no records and no bank account. It was a shadow corporation whose only asset was a corporate certificate used by N.P.S. as a shield to deflect its own liability for breach of contract.

Therefore, the court finds that N.P.S.I. was the alter ego or instrumentality of N.P.S. Corp. It is clear that Halpern's wrongful withdrawal of the guarantee and his instruction to Barton on the eve of closing the sale derailed the purchase of the F & S assets. The damages suffered by the debtor's estate were a direct result of these actions. Consequently, it would be inequitable for the court to bar recovery to the trustee by refusing to pierce the corporate veil. Therefore, N.P.S. is held liable for any damages caused by N.P.S.I.

*The Contract*

■ The defendants cite the Uniform Commercial Code § 2–201, Statute of Frauds, (McKinney 1964) as their basis for arguing that an enforceable contract never existed between the parties. They deny the existence of a signed writing memorializing the agreement reached between the trustee and N.P.S.I. The trustee contends that the written offer of N.P.S.I. dated April 29, 1983 and signed by Melvin Slade, Esq., attorney for N.P.S.I., contained all essential terms and conditions of sale, thereby satisfying the requirements of the statute of frauds. Furthermore, she argues that N.P.S.I. had full knowledge that the sale could not be concluded without the approval of the bankruptcy court, which was obtained by order dated July 7, 1983.

The defendants incorrectly narrowly construe the statute of frauds. The statute does not require a single writing but may be satisfied by a series of writings setting forth the essential terms of the contract, even if all are not signed by the party charged. *East Europe Domestic Int'l. Sales Corp. v. Island Creek Coal Sales Co.*, 572 F.Supp. 702, 706 (S.D.N.Y.1983); *APS Food Systems, Inc. v. Ward Foods, Inc.*, 70 A.D.2d 483, 421 N.Y.S.2d 223 (App. Div. 1st Dept.1979). Thus, "[t]he 'memorandum in writing of the contract or sale'

... may be pieced together out of several writings." *Wool Products, Inc. v. Buff*, 109 N.Y.S.2d 324, 327 (1952); *Clinton Paper Co. v. Mills Paper Co.*, 83 N.Y.S.2d 875 (1948), *aff'd.*, 275 A.D. 665, 87 N.Y.S.2d 918 (1949).

Among the evidence adduced at trial is several writings which when read together adequately satisfy the requirement of U.C.C. § 2–201 (McKinney 1964). The initial offer was written and signed by the agent of the defendant. The non-compete agreement of A.A. Shamah addressed to N.P.S.I., Inc. and held in escrow until the closing of the sale specifically states, "The agreements and covenants of the undersigned contained in this letter are a condition precedent to the purchase of the assets of F & S by you...." Furthermore, the letter of July 28, 1983 written by William L. Weiss, Esq. to Gene L. Wexler, Esq. of Slade & Pellman, listed various enclosures and stated: "We are delivering the enclosures to you in escrow, to be held against a closing of the acquisition of the F & S assets by N.P.S.I." On July 29, 1983 Wexler wrote to Bruce Eisenberg, Esq. of N.P.S. Corp.:

This is to confirm that Judge Parente has directed us to close the purchase of assets from the Trustee of F & S Central Manufacturing Corp. ("F & S") Monday, August 1, 1983 at 10 a.m. The closing will take place at the offices of Slade & Pellman.

The purchase price of $1,650,000 will be adjusted downward by $19,500 to reflect damages to the assets. At the closing, N.P.S.I. will pay this adjusted purchase price to the Trustee. In addition, there will be an evidentiary hearing after the closing to determine the value of our $42,000 claim with respect to missing assets.

The following persons must be present at the closing to execute and deliver documents: Jack Barton, as President of N.P.S.I., Robert Paladino, as Assistant Secretary of N.P.S.I., and Robert Paladino, as Assistant Secretary of N.P.S. Corp., for the Guaranty.

Enclosed is a marked-up two page index, which lists the documents and check to be delivered at closing.

When these writings are read collectively, it becomes clear that both parties intended to enter into a contract and had in fact entered into one for the sale of the F & S assets.

Furthermore, the defendants rely on subsection (1) of U.C.C. § 2–201 and neglect subsection (3)(b), which provides:

A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable (b) if the party against whom enforcement is sought admits in his pleadings, *testimony* or otherwise in court that a contract for sale was made....

U.C.C. § 2–201 (McKinney 1964) (emphasis added).

Mona Lipp, Esq., the attorney for N.P.S.I., asked the court on July 28, 1983 to set August 1, 1983 as a firm closing date. This action indicates that the defendants knew they had entered into a contract to purchase the assets of F & S Central and were in fact eager to do so. It is illogical to believe that the attorney representing N.P.S.I. would press the court for an immediate closing date if it did not have a contract for the purchase of the F & S assets. While, pursuant to U.C.C. § 2–201(3)(b), the in-court testimony alone, without any written memoranda, suffices to prove an enforceable contract, the combination of the writings and testimony unequivocally lead to the conclusion that the statute of frauds is satisfied. *Martocci v. Greater New York Brewery, Inc.*, 301 N.Y. 57, 92 N.E.2d 887 (1950).

The combination of writings and testimony not only establish the existence of an enforceable contract, but indicate that all conditions precedent had been waived, were satisfied or would be satisfied at closing. The certified order of the bankruptcy court and the non-compete agreement of Mr. Shamah were held in escrow at the offices of Slade & Pellman, and all necessary bills of sale and lease assignments were drafted and prepared for signing on August 1.

Consequently, the refusal to purchase the assets of F & S by N.P.S.I. under direct orders of N.P.S. constituted a clear breach of contract resulting in damage to the bankruptcy estate.

The extent of damages incurred is disputed by the parties. The court is persuaded by the trustee, who fixes damages at $550,000.00. This figure represents the difference between the price actually received on the sale of the assets to Carpenter & Patterson, $1,100,000.00, and the $1,650,000.00 contract price with N.P.S.I.

The defendants' allegation that only $200,000.00 of this sum represents actual damage to the estate is unfounded and unrealistic. It is immaterial that the secured creditor ultimately settled for $1,000,000.00 instead of the $1,200,000.00 it originally intended to realize. Such a settlement attests to the skill of the trustee in performing her fiduciary duties on behalf of the unsecured creditors, and is not intended to benefit the party breaching an enforceable contract. Therefore, the sum of $550,000.00 represents the damage to the bankruptcy estate before claims are paid and if subsequently $200,000.00 less is required to satisfy the claims of the secured creditor, that sum becomes available for distribution to the unsecured creditors.

It is, however, inappropriate to award attorney's fees of $50,000.00 to the trustee. These fees were incurred over the entire period of negotiation and sale beginning in March, 1983 and not exclusively related to the defendants' breach of contract. Furthermore, the interest fee of $44,346.65 is not awarded to the trustee because it assumes that the entire sum of $550,000.00 would have earned interest for the period from August 1 to November 18, 1983, when in fact some, if not all, of these funds would have been distributed to creditors during this time period.

The court concludes that the sum of $550,000.00 is due the trustee from both defendants, N.P.S.I. and N.P.S. Corp., for damages incurred as the result of a breach of contract by a subsidiary of a corporation

which was nothing more than an alter ego or instrumentality of its parent.

SO ORDERED.